IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION

_____

Michael Fink,                                                                          Civil No.

          Plaintiff,

vs.                                                                                              Complaint

BNSF Railway Company,
a corporation,

          Defendant.
_____

COMES NOW the Plaintiff Michael Fink, and for his claims and causes of action against Defendant, states and alleges as follows:

1. That at all times material herein, Plaintiff was a resident of Bismarck, North Dakota.

2. That at all times material herein, Defendant BNSF Railway Company ("BNSF") was and is a Delaware corporation organized and existing as a common carrier for hire by rail in and throughout the several States of the United States and for the purpose of operating said railroad did and does own, possess, operate and maintain, railroad cars, tracks, and other equipment in and about the County of Burleigh and throughout the State of North Dakota.

3. Plaintiff, Michael Fink, was employed by defendant BNSF as their servant and employee, and as such was working and engaged in interstate transportation and

commerce and was working in furtherance of Defendant BNSF's interstate commerce and in work in which closely, directly, and substantially affected the interstate commerce carried on by said defendant BNSF as a railroad common carrier freight for hire.

## JURISDICTION AND VENUE

4. This action arises under a federal statute, Title 49 U.S.C. § 20109(d)(3), and is timely commenced thereunder. On or before October 2, 2019, Mr. Fink filed a complaint with the Secretary of Labor alleging that BNSF violated 49 U.S.C. § 20109.  More than 210 days have elapsed since Mr. Fink filed that complaint, the Secretary of Labor has not issued a final decision, and there is no allegation or proof that the delay is due to any bad faith on the part of Mr. Fink.

5. Venue is proper in the Western Division of North Dakota pursuant to 28 U.S.C. § 1391. A substantial part of the events, acts, and/or omissions giving rise to Plaintiff's claim in this action occurred in the judicial district.  Plaintiff resides in the judicial district.  And because BNSF conducts business in this judicial district and has sufficient contact with this judicial district, this Court has personal jurisdiction over BNSF.

## VIOLATIONS OF 49 U.S.C. § 20109

6. Each and every preceding paragraph is incorporated herein in its entirety by this reference.

7. Mr. Fink engaged in various incidents of protected activity, as statutorily defined by the whistleblower-protection provisions of the Federal Rail Safety Act, codified

at 49 U.S.C. § 20109. These protected activities include, but are not necessarily limited the facts outlined in the paragraphs below:

### COUNT I

8. During the 2017/2018 winter, there were several instances of BNSF coal trains and empty coal cars not properly going into emergency brake application. This included an incident in Hettinger, SD, where a train broke in two pieces and should have gone into its emergency braking application, resulting in train cars freely and uncontrollably rolling through several grade crossings in several towns. There was ongoing discussion between management, engineers (including Plaintiff), and service about the issue, but no resolution. The issues stopped when warmer temperatures returned, and BNSF management ignored the incident.

9. With the return of cold weather in the winter of 2018, there were again multiple instances of coal trains not properly going into emergency braking application. Inquires revealed that the control valves on coal cars a life expectancy of 10 years and need to be serviced or replaced. BNSF was aware of this and continued using cars that had control valves that were over 20 years old.

10. As the winter progressed into 2019, several additional issues with coal trains not properly going into emergency brake application continued to occur. BNSF Management brought in high ranking officials from Ft. Worth, TX (BNSF headquarters), experts from the control valve company, and GE Company to assess the issue. Findings indicated that not only were the control valves past their effective life span but also that BNSF, in an effort to reduce costs, had decided not

to do the recommended maintenance on the control valves every three years as they had done previously.

11. After this inquiry, BNSF initially prohibited any train that would not go into emergency from the leaving the terminal—as it should—until cars with bad valves were removed from the train. This resulted in more time and additional costs in order to address the valves and make sure the trains were safe.

12. On February 5, 2019, BNSF management began requiring all BNSF crews to utilize the "Inbound Train Inspection Rule" on outbound trains.  The only possible reason for applying this rule to outbound trains was to hide the emergency braking issue and to not slow down train traffic.  The impact of this policy change was that crews were being instructed to draw the train's brakes to zero before separating a train, thereby leaving the crew in the dark as to whether the train would make a proper emergency brake application.

13. It is incredibly dangerous to BNSF employees and the public if trains do not go into emergency braking.  It is likewise incredibly dangerous if train crews are operating trains without knowing if they have fully functioning emergency brakes.  The effect of BNSF's new policy was to ensure that trains crews did not know if its trains will go into emergency braking when needed, which is an extremely serious safety concern.  Essentially, BNSF's actions masked one serious safety concern (trains not braking) and intentionally created another (not allowing train crews to learn if a train's braking system was faulty so that the train would not be moved and could be fixed).

14. On February 5, 2019, BNSF implemented its policy to mask the emergency braking issues.

15. February 5, 2019 is the same date the event occurred in which BNSF alleges an event occurred in which Plaintiff was allegedly dishonest (for which he was subsequently terminated). After the incident that BNSF alleges Plaintiff's dishonesty occurred, Plaintiff was told by Trainmaster Sean Schneider to not be concerned about the event because the condition (a damaged switch) had been caused by maintenance of way employees who would fix it the next day when it was warmer outside.

16. Immediately after being told not to be concerned about the bad switch, and Plaintiff raised (with Trainmaster Schneider) the issue of the policy change that was designed to mask the emergency brake issue, which had been implemented by BNSF earlier that day.

17. After Plaintiff raised the issue with Trainmaster Schneider, Trainmaster Schneider responded that Plaintiff should inform Road Foreman of Engines ("RFE") Selzer about the safety concerns Plaintiff had. Trainmaster Schneider told Plaintiff to use the phone in his office and they called RFE Selzer together. Trainmaster Schneider was present in the office for the entire conversation with RFE Selzer and heard the entire conversation, most of which was on speaker phone with Trainmaster Schneider present.

18. During this conversation, Plaintiff explained that the rule was being incorrectly and inappropriately applied in an effort by management to hide the emergency

braking issues on trains from the crews operating them. Plaintiff expressed concerns that this was an extremely unsafe practice and that continuing to use this rule in this manner could result in injury or death of crew members and members of the public.

19. On or about February 10, 2019, Plaintiff was working as an engineer operating a coal train from Mandan, ND, to Dilworth, MN. Plaintiff and his conductor were told that the train was ready to go in Mandan. As the train was traveling at 51 mph past Eldridge, ND, the rear end units on the train reported emergency braking. When this happens, the head end of the train should also go into emergency braking. This did not happen. Plaintiff was able to stop the head end of the train with combined dynamic braking and air braking (not emergency braking, which was not working). Justin Selzer (road foreman of engines) responded to the incident by radio and phone, stating that "the train stopped pretty good for not properly braking." Plaintiff reported this issue to the FRA.

20. On or about February 14, 2019, Plaintiff received the investigation notice in relation to an event in which BNSF alleged Plaintiff was dishonest, failed to protect a shove, and for failing to report a damaged switch. This event is discussed in paragraphs below.

21. On or about February 16, 2019, Plaintiff was asked to operate a train from Mandan, ND, to Glendive, MT. After a Class I air test, Plaintiff and his conductor discovered that the train was not properly going into emergency. Plaintiff refused to move train out of the yard without a functioning emergency braking system

because it extremely unsafe to do so, not just to the train crew, but the public. Plaintiff and his conductor and then offered to work on resolving the issue by finding and setting out the cars with the bad valves that were preventing the train from properly going into emergency. Plaintiff offered to do this work because it was unsafe to move the train out of the yard until this was completed because if there was an issue between Mandan and Glendive that required an emergency braking application there would serious safety risks for the crew and the public.

22. Rather than allowing Plaintiff to perform this work to make sure the emergency braking system on the train was functioning correctly, the Trainmaster on duty instructed the yardmaster to call a different train crew in to transport the train out of Mandan and to Glendive without a fully functioning emergency braking system. The crew that was called in was not informed that the emergency braking was not functioning and were sent to Glendive without the issues being resolved or being aware that the train was unsafe. This action exposed both the crew and public to serious safety risks. Plaintiff reported this occurrence to the FRA.

23. Plaintiff's reports in paragraphs 19 and 22 above are protected activity under Section 20109.

## COUNT II

24. On August 7, 2017, Plaintiff, was working with brakeman Cary Jurgens near a concrete/gravel industry (Strata) in Jamestown, North Dakota.

25. Mr. Jurgens was injured at this location, suffering an injury to his after falling, for what he reported as (and jury later confirmed) were hazardous conditions

walking conditions, mainly steep, sloped ballast. There were also weeds and vegetation in the walkway that presented a tripping hazard at this location, which interfered with the ability to perform normal trackside duties in violation of 49 CFR 213.37(c).

26. Approximately two years before Mr. Jurgens' accident, Plaintiff Fink had verbally reported to his supervisor, BNSF Trainmaster Montgomery, that there were hazardous walking conditions at the Strata location, and that a reasonable walkway should be placed. The hazardous walking conditions reported were the steep, sloped ballast (susceptible to rolling under your feet) upon which employees were required to walk in order to perform their trackside duties. Nothing was done in response to Plaintiff's verbal report and request for a safe walkway before Mr. Jurgens' injury.

27. Mr. Jurgens initiated a lawsuit under the Federal Employers Liability Act ("FELA"), based upon BNSF not providing a safe walkway at the location and violating 49 CFR 213.37(c).

28. As part of Mr. Jurgens' claim, BNSF ordered Plaintiff to attend a deposition, which occurred on 10-9-18. The week before that deposition occurred, BNSF claims representative Tony Freidig requested that Plaintiff meet with him and one of BNSF's attorneys before they took his deposition. During that meeting, BNSF's attorney asked Plaintiff to give testimony in his upcoming deposition that was unfavorable to Mr. Jurgens, namely seeking testimony from Plaintiff

8

alleging that Mr. Jurgens was already injured before he fell on August 7, 2017, and/or that he had been struggling to physically perform his work duties due to an injury before he fell on August 7, 2017. Plaintiff knew this to be false based on his perceptions of Mr. Jurgens and informed them that he would not give such false testimony. In response, BNSF reiterated to Plaintiff that it would be very helpful to BNSF if he could give such testimony. Plaintiff again stated that he could not do so truthfully.

29. During his 10-9-18 deposition, Plaintiff was asked questions by attorneys for both Mr. Jurgens and BNSF concerning the walking conditions at Strata. In response, Plaintiff testified that:

- The steepness of slope in the walking area at the accident site was hazardous;
- The large and non-compacted ballast made for a poor, unstable walking surface;
- Because weeds in the walkway had been sprayed too late and were not cut down, they were stiff, and Plaintiff considered them a tripping hazard.
- That—before Jurgens' injury—Plaintiff himself had slipped/fell on the ballast near this location, reported the steepness and instability of the walkway at the location to Trainmaster Montgomery, and that Plaintiff had requested that a better walkway be put in.

30. In relation to the Jurgens FELA case, my testimony concerning the hazardous walking conditions and vegetation (49 CFR 213.37(c)) was included in expert witness reports and discussed in several case-related pleadings in Federal District Court (North Dakota).

31. In particular, on March 1, 2019, BNSF sought to dismiss Jurgens' claim because there allegedly had been no complaints about the walking conditions prior to Jurgens' injury. That motion was denied, because it was in direct conflict with Plaintiff's testimony that he had previously reported the hazardous walking conditions to Trainmaster Montgomery and requested that a safe walkway be put in. Shortly before BNSF filed its motion (3-1-19), Plaintiff was noticed for a disciplinary investigation (2-14-19), for alleged dishonesty.

32. Trial in the Jurgens matter was already set to begin in late-June, which BNSF was aware of before it terminated Plaintiff.

33. BNSF sought to use Plaintiff's termination to discredit his testimony concerning safety hazards and FRA violations at the upcoming Jurgens' trial, through formal pleadings submitted on June 10, 2019. Specifically, BNSF sought to use Plaintiff's "involuntary termination affects his credibility and bias."

34. On June 17 and 18, 2019, despite BNSF's efforts to his involuntary termination to discredit him and paint him as biased, Plaintiff testified in Mr. Jurgens FELA trial. Consistent with his earlier deposition testimony, Plaintiff described the hazardous walking conditions and the vegetation that posed a tripping hazard in violation of 49 CFR 213.37(c). On June 21, 2019, the jury determined that BNSF was negligent because: (1) the walkway was

unsafe; and (2) BNSF violated 49 CFR 213.37(c), due to vegetation in the walkway interfering with trackside duties.

## Pretext, Retaliation, and Termination

35. On February 5, 2019 (the same day Plaintiff reported the safety hazards and regulatory violations to BNSF management), Plaintiff was working as an engineer with two conductors. Their work took them to BNSF's Jamestown, North Dakota, rail yard, where they were to pick up an additional locomotive and proceed to another rail yard in Dilworth, Minnesota. These duties required the crew to "shove" their train into the correct track in the yard to attach the locomotive to the rear of the crew's train.

36. "Shoving," in lay terms, essentially means to back the train up. Because trains are long and there are not rear-end cameras, when this procedure is performed locomotive engineers (who operate the locomotives) cannot see the rear end of the train or tracks/switches they are shoving into. It is, thus, required that the conductor(s) on the train crew "protect" the shove, by ensuring that all of the switches are properly lined and that the tracks they are shoving onto are clear. Because the engineer is on the head-end of the movement and cannot see behind him, the engineer is dependent upon the conductors to protect the shove and the conductors protecting the shove are the eyes and ears of the engineer.

37. Because the conductors are the eyes and ears during a shoving movement, they control the movement and the engineer is required to follow their instructions.

38. Before conducting the shove, the two conductors got off the locomotive and walked to the switches that controlled the movement into the track they were shoving into.  This was part of the conductors' duties to protect the shove, make sure the switches were properly lined, and to ensure the track was clear for the shove.  Plaintiff, as required, remained in the locomotive can to operate the locomotive and waited for the instructions from the conductors.

39. The two conductors, Mr. Carroll and Mr. Christianson were riding on the side of the last car of the train to protect the shove.  Mr. Carroll instructed Plaintiff to shove backwards 20 car lengths.  A coating of snow covered the tracks and neither conductor was aware that two switches were required to be lined to enter the track, instead of one.

40. As the conductors approached the first switch, they noticed it for the first time and they became aware that it was not properly lined.  Mr. Christianson radioed for Plaintiff to stop, so that they could line the switch into the yard.  The conductors then instructed Plaintiff to move back forward (the direction they we had just come) one car length (car lengths are used as a term of distance measurement on the railroad) so that they could have more room to throw the switch.  When they got off of the car to properly line the switch, the conductors noticed that it was possibly damaged and walked back to the locomotive where Plaintiff.  After discussing the possible damage, Plaintiff and the conductors walked back to the switch to examine it.

41. Upon examination, the switch appeared damage, but it also appeared that the last car had not entered the switch area to damage it. Plaintiff inquired as to whether the conductors had instructed Plaintiff to stop the train movement before it could enter the improperly lined switch and potentially damage it. The conductors responded that the rear-end of the train had come close to the switch, but that they had instructed Plaintiff to stop before they had entered the switch.

42. Because Plaintiff could not possibly see the rear of the train during the movement, he was entirely dependent upon the conductors' explanation for what had occurred, as they were acting as his "eyes and ears." Plaintiff could also not see where the rear car had come to rest, as the conductors had instructed him to move the train forward before he could examine the area on foot. Because it was impossible for Plaintiff to see the rear end of the train during the shove and that Mr. Carroll and Mr. Christianson were protecting the shove, Plaintiff was entirely dependent upon the information they provided to him as to where the shove stopped before the switch and as to whether the switch was damaged before they arrived

43. After examining the switch, Plaintiff determined that it was likely damaged and that it was not safe to operate the train through it. Plaintiff then immediately "bad ordered" the switch, tagged it out of service, and called BNSF dispatch.

44. All communications with the dispatcher were on a cell phone, which was on speaker phone, with all three crew members present for the entire conversation. Plaintiff informed dispatch that the switch was damaged, they had tagged it out of

service, and that Plaintiff was not comfortable operating the train through it. Plaintiff asked that the dispatcher let maintenance know.

45. Plaintiff did not have—and could not have had—first-hand knowledge of the what happened at the rear-end of the shoving event and told the dispatcher what Mr. Carroll and Mr. Christianson had reported to him, that the conductors had ordered him to stop the train before going through the switch and that the switch was damaged before they arrived.  At no time did Mr. Carroll or Mr. Christianson make any corrections on how they had reported to Plaintiff how the shoving movement occurred or the condition of the switch.

46. When Plaintiff and the conductors arrived in Dilworth, they sought out Trainmaster Schneider to personally report the damaged switch to him.  Mr. Christianson and Mr. Carroll told him that they had come close to the switch, but did not think they had gone through it.  Plaintiff was wholly reliant on that reporting of events and repeated what Mr. Christianson and Mr. Carroll had just reported to the trainmaster: that the conductors had controlled the movement and that the rear-end of the train came close to switch, and that it was unclear if their train had caused the damage or if it has been damaged before they arrived.

47. Trainmaster Schneider told the crew not to worry about the switch because he believed that somebody from the maintenance department had damaged the switch earlier in the day but did not repair because of the cold weather, but maintenance would return in the morning when it was warmer outside.

48. Trainmaster Schneider then asked the crew to give a written statement. Plaintiff again repeated the events that were reported to him by the conductors and based on Trainmaster's Schneider's report that a maintenance crew had damaged the switch before Plaintiff's train crew arrived.

49. It would have been dishonest for Plaintiff to report anything other than what the conductors had reported to him because he had no sight lines or way of seeing the switch and had been instructed to move ahead by the conductors.

50. There was no motivation for Plaintiff to dishonestly report how the switch had been damaged because he was not in control of the shoving movement and could not be disciplined for any failure of the conductors to protect the shove or properly line the switch.

51. At that point, Plaintiff raised to Trainmaster Schneider and Road Foreman Selzer the emergency braking issue and BNSF's newly implemented policy of not checking outbound trains to make sure they would go into emergency braking.

52. The crew left unconcerned of the event.

53. On February 14, 2019, Plaintiff received from BNSF a notice of an investigation for not reporting the switch incident, failing to protect the shove, and dishonesty.

54. BNSF's investigation hearing occurred on March 21, 2019.

55. During the investigation hearing, the testimony of the two conductors was that:

    - There was no way Plaintiff could have seen the switch;
    - The conductors were in charge of protecting the shove;

- That Plaintiff was merely reporting what the conductors (his eyes and ears) had reported to him;

- That it would have been dishonest for Plaintiff to report anything other than what the conductors had reported to him because he had no sight lines or way of seeing the switch and had been instructed to move ahead.

56. During the investigation hearing, Trainmaster Schneider acknowledge in his testimony that:

- That it was possible for the conductors to have not realized that the switch had been entered by the train if the rear car's wheel had entered the switch only a little;

- The conductors could have partially gotten into the switch and not realized it;

- All of the crew had reported that they had come close to the switch, but did not think they entered it;

- If the conductors did not know they partially entered the switch, they properly reported everything;

- He took no issue with how the crew did their work, how they reported and bad ordered the switch, and their work in securing the train was exemplary;

- The conductors were Plaintiff's (the engineer's) eyes and ears.

57. The conductors testified that I could not have known what occurred at the rear of the train because I could not possibly see. They confirmed that they were in charge of protecting the shove and controlling the movements. They confirmed that I merely reported what they reported to me, that I could not have known more, and that what I reported to Trainmaster Schneider and the dispatcher was what the conductors had reported to me.

58. At the investigation, Plaintiff testified he was being retaliated against for him reporting and testimony related to the hazardous conditions and FRA violations in the Jurgens case and in connection to his reporting of the emergency braking issues. The BNSF officer conducting the hearing said that he was trying to get the facts, but acknowledge that "there's a little history there."

59. The allegations for Plaintiff failing to report the damaged switch and not properly protecting the shove were dropped, but he was fired on April 5, 2019, for "dishonesty" in reporting how the switch was or was not damaged.

### Violation of the FRSA

60. At the time that BNSF took the above-described adverse actions, BNSF, its employees, and/or its officers were aware that Plaintiff had engaged in protected the protected activity outlined in Counts I and II.

61. BNSF's decision terminate Plaintiff were due, in whole or in part, to his engagement in protected activity. That is evidenced by facts and circumstances including but not limited to the following:

    a. There is close temporal proximity between the protected activities outlined in Count's I and II and the adverse action;

    b. Plaintiff's protected activity is "inextricably intertwined" with the adverse actions he was subjected to;

    c. Shifting explanations concerning the events surrounding his termination;

    d. Pretext and attempts to use his termination to discredit his reports of safety hazards and regulatory violations;

    e. Inconsistent application of BNSF's rules and disciplinary actions against Plaintiff when compared to other locomotive engineers;

    f. Change in BNSF's attitude after Plaintiff engaged in protected activity;

    g. Falsity of BNSF explanation concerning the circumstances of Plaintiff's termination.

62. BNSF, its officers, and/or its employees, made the determination to terminate Plaintiff due, in whole or in part, to the fact that he had engaged in on or more of the protected activities outline above.

63. The actions that BNSF, its officers, and/or its employees took to terminate Plaintiff were in violation of 49 U.S.C. § 20109.

64. As a result of the actions that BNSF, its officers, and or its employees took against Plaintiff, he has suffered damages that include, but are not limited to, to the following:

    a. Lost wages, benefits, and pension;

    b. Being force to accept lower paying employment;

    c. Emotional distress, pain, suffering, and loss of enjoyment of life because of the termination;

    d. Litigation costs such as expenses for deposition recording and transcription expert consulting and testimony, and other compensable costs;

    e. Reasonable attorneys' fees including but not limited to those associated with pursuing this claim through administrative and judicial channels through trial and appeal.

65. Based on all of the allegations outlined above, Plaintiff demands and prays that the Court enter judgment in his favor and against BNSF for all relief necessary to make Plaintiff whole including but not limited to relief in the form of:

    a. An award of backpay with interest appropriately compounded;

    b. An award of future lost wages and earning capacity;

    c. An award of benefits lost, including but not limited to credit for months of service that Plaintiff would have earned with the Railroad Retirement Board absent BNSF's termination of his employment;

    d. An award for emotional distress, pain, suffering, and loss of enjoyment of life;

    e. An award for any and all other compensatory damages including litigation costs and reasonable attorneys' fees;

    f. An award for the negative tax consequences of compensatory damages'

    g. An award of any other cost, disbursements, and interest allowed by law an/of equity;

    h. Relief requiring BNSF to:

        a. Immediately reinstate Plaintiff to his former position at the applicable rate, including all rights, seniority, and benefits—including applicable overtime—that Plaintiff would have enjoyed had BNSF never terminated his employment;

  b. Permanently post notice of employees' rights under the FRSA in BNSF workplaces, as required by OSHA; and

  c. Train its employees and officers on employees' rights under the FRSA.

66. Plaintiff also prays for punitive damages not to exceed $250,000 under 49 U.S.C. § 20109(e)(3) to punish BNSF for its unlawful activity and to deter BNSF from engaging in such unlawful activity in the future.

WHEREFORE, Plaintiff Fink prays for judgment against the above named Defendant, BNSF, a Delaware corporation, for recovery of reasonable damages in an amount sufficient to fully compensate Plaintiff for the damages and losses suffered, together with all costs, disbursements and whatever other relief the Court deems appropriate.

## PLAINTIFF DEMANDS TRIAL BY JURY

Plaintiff herby makes and files a written demand for a trial by jury in this action of all issues so triable per 49 U.S.C. § 20109(d)(3) and/or any other controlling authority.

          BOLT HOFFER BOYD LAW FIRM

Dated: __12/03/2020_____ By _____

          Joseph M. Sayler, I.D. # 388895
          Attorney for Plaintiff
          2150 Third Avenue North, Suite 350
          Anoka, Minnesota  55303
          (763) 406-7000