**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
WESTERN DIVISION**

| | |
|---|---|
| Michael Fink, | Court File No. 1:20-CV-222-DLH-CRH |
| Plaintiff, | |
| vs. | **BNSF RAILWAY COMPANY'S** |
| | **MEMORANDUM OF LAW IN** |
| BNSF RAILWAY COMPANY, a | **SUPPORT OF ITS MOTION FOR** |
| Delaware corporation, | **SUMMARY JUDGMENT** |
| Defendant. | |

BNSF Railway Company ("BNSF") dismissed Plaintiff Michael Fink after a formal investigation hearing persuaded its managers that Fink had not been fully honest when reporting how a piece of railroad equipment had been damaged. Namely, he failed to mention that his crew had damaged the equipment. In this lawsuit, he alleges that BNSF violated the Federal Railroad Safety Act (FRSA), 49 U.S.C. § 20109, which prohibits a railroad from dismissing an employee for reporting a hazardous safety condition. The undisputed facts, however, show that his claims fail as a matter of law for two independent reasons.

First, Fink cannot establish the *prima facie* elements of his FRSA wrongful-discharge claim because he has no evidence that his alleged protected activity was a contributing factor in his dismissal. Second, even if he did have such evidence, BNSF is entitled to summary judgment on its affirmative defense

because clear and convincing evidence shows that BNSF would have dismissed Fink for his dishonesty, regardless of any alleged protected activity.

Finally, even were the Court to determine that Fink's FRSA claim could survive summary judgment, the Court should still dismiss his claim for punitive damages, because there is no evidence in the record that BNSF acted callously or with reckless disregard or somehow violated federal law.

## UNDISPUTED FACTS

## I.    THE PARTIES.

BNSF operates a freight railroad operation over parts of the United States, including the state of North Dakota. Plaintiff Michael Fink worked for BNSF as a locomotive engineer. The engineer is responsible for "the safety and protection of their train and observance of the rules." (*See* Excerpts of BNSF's General Code of Operating Rule ("GCOR"), attached to the Affidavit of R. John Wells (hereinafter "Wells Aff.") as Ex. 1, at FINK_BNSF_000501.)

## II.   PLAINTIFF'S FRSA CLAIM.

### A.    Background.

BNSF instructs its locomotive engineers on applicable safety and operating rules, including those in BNSF's GCOR. (*Id.*)  GCOR Rule 1.6 prohibits specific types of employee misconduct, including dishonesty:

**1.6 Conduct**

Employees must not be:

1. Careless of the safety of themselves or others.
2. Negligent.
3. Insubordinate.
4. Dishonest.
5. Immoral.
6. Quarrelsome.
   or
7. Discourteous.

Any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal and must be reported. Indifference to duty or to the performance of duty will not be tolerated.

(*See* Wells. Aff. Ex. 1 at FINK_BNSF_000493.)

**B.     The Collective Bargaining Agreement Lays Out the Process for A Disciplinary Investigation.**

Fink is a member of an employee union: the Brotherhood of Locomotive Engineers, which has a collective bargaining agreement with BNSF. (*See* Excerpts from Collective Bargaining Agreement, Wells Aff. Ex. 2.) In that collective bargaining agreement, the parties agreed to a disciplinary procedure that must be followed before any employee may be disciplined. (*Id*. at FINK_BNSF_000212.) The procedure entitles the employee to written notice of the alleged misconduct and a formal investigation hearing. (*Id*.) At that hearing, the employee is represented by a union official and has the right to tell his side of the story, present witnesses and evidence, and question BNSF's witnesses and evidence. Following the formal investigation hearing, BNSF must render a

prompt decision (*Id*.) If the employee disagrees with that decision, the collective bargaining agreement provides him multiple appeal options. (*Id*.)

### C.  BNSF's Discipline Policy.

BNSF's progressive-discipline policy, the Policy for Employee Performance Accountability ("PEPA") states that "[w]orking safely and treating others with honesty and respect are core values at BNSF." (*See* Corporate Policy Employee Performance Accountability, Doc. No. 19-2.) The Policy includes a non-exhaustive list of "Stand-Alone Dismissible Violations," which include "[d]ishonesty about any job-related subject." (*Id*.)

### D.  Fink's February 5, 2019 Train Trip.

On February 5, 2019, Fink was part of a three-man crew that included two conductors: Aaron Christianson and Daniel Carroll. (*See* Fink Deposition Transcript, Wells Aff. Ex. 3, at 52:2-19.) Carroll was a new hire, or "student conductor." (*Id*. at 53:14-21; 57:14-22.)

While they were working near a railyard in Jamestown, North Dakota, known as the Jamestown Yard, the two conductors got off the train to secure the railcars and detach the locomotives. (*Id*. at 62-63.) In order to pick up the cars in the Jamestown Yard, the conductors left the rail cars that were in the consist of their train on the mainline track outside of the yard in order to run the locomotives back to the railcars in the yard that they were to pick up and then incorporate into their train.  The conductors were not in the locomotive's cab with Fink – he did not know whether they had boarded the last locomotive after detaching the cars.

(*Id*.)  In  this  type  of  movement,  called  a  reverse  shove,  the  conductors  are responsible to "protect the shove," or ensure that all switches are properly lined and  that  there  is  nothing  obstructing  the  locomotive's  movement.  (Demarais Depo., Ex. 4, at 43:18-44:9). Fink then moved the train in reverse toward a crossover switch—which is a mechanism that allows tracks to be manually shifted from one set of tracks to another at the yard's entrance. (Fink Depo, Ex. 3, at 62-63.) If a switch is not properly lined in the direction of the train's travel, a locomotive  can  derail,  and  running  through  an  improperly  lined  switch  will damage the switching equipment.  (*Id*. at 70:22-71:7).

After moving a distance equivalent to "just a few cars," Christianson called over the radio for Fink to "stop the train," and to pull the locomotive forward. (*Id*. at 67:4-19.) After a while, Fink looked out of the mirror and saw both conductors walking up to the locomotive. (*Id*. 67:20-68:12.) Fink testified that the conductors came into the cab of the locomotive and told him that "the switch looked funny," and  that  there  were  spaces  on  both  sides  of  it.  (*Id*.  at  68:13-24.)    Additionally, Fink testified that he asked the conductors if they had damaged the switch, and the conductors stated "No, we stopped short of the switch." (*Id*. at 70:11-21.) Fink testified he then got out of the locomotive, and walked back to take a look at the switch, because the conductors "didn't explain it in a way that made sense." (*Id*. at 71:11-24.) Fink expressed confusion with the conductors' story, given "their experience  level,"  and  he  agreed  it  was  possible  the  train  went  through  the

switch when it was not lined properly. (*Id.* at 71:15-16, 72:6-9.) Once he got to the switch, Fink testified it was "clearly damaged." (*Id*. at 74:8-15.)

After conferring again with his crew near the damaged switch, Fink called the dispatcher and told them that the crew <u>had stopped short and the switch in Jamestown was damaged</u>. (*Id*. at 74:9-15; 76:19-77:23.) (emphasis added). He did not report that he and his crew had caused the damage to the switch by driving into it.

## E.   In Accordance with the CBA, BNSF Investigates Potential Dishonesty.

BNSF investigated the cause of the damage to the switch, and in the course of that investigation reviewed locomotive video from February 5, 2019. The investigators determined the video showed the locomotive running into the switch. (*See* Screenshots of Inward and Outward Facing Locomotive Video, FINK_BNSF_002545, Wells Aff. Ex. 5, with the switch circled in red.)



(*Id*. at 14:40.) The video subsequently shows the locomotives move forward and run into the improperly lined switch:





(*Id*. at 14:43; 14:45; 14:50.) The BNSF invdividuals reviewing the video determined that it contradicted Fink's claims that the locomotive had stopped short of the switch. (*See* Sean Schneider Deposition Transcript, Wells Aff. Ex. 6, at 27:17-24; Deposition Transcript of Anthony Keel, Wells Aff. Ex. 7, at 86:9-11; Deposition Transcript of Jacob DeMarais Wells Aff. Ex. 4 at 43:1-4.)[1]  Moreover, the video shows Fink, Christianson, and Carroll conferring after damaging the switch. (Wells Aff. Ex. 5 at 27:42.)

BNSF sent a notice of an investigation to Fink, Christianson, and Carroll on February 14, 2019. (*See* Notice of Investigation, Wells Aff. Ex. 9.) With the notice, BNSF informed Fink, Christianson, and Carroll that the investigation was to ascertain facts and determine responsibility if any, in connection with alleged carelessness to the safety of themselves and others when they failed to report

---

[1] This determination is consistent with the belief of others, including Fink's own union representative.  During his deposition in this case, Local Chairman Cordell Booke testified that based on his experience and understanding he believes Fink's crew actually ran into the switch with the leading wheel of the locomotive. (*See* Cordell Booke Deposition Transcript, Wells Aff. Ex. 8 at 104:11-12; 119:6-10).

damaging a crossover switch, dishonesty in providing factual information associated with the damaged switch, and failure to properly protect a shove. (*Id*.)

The investigation hearing was held on March 21, 2019. (*See* Investigation Transcript, Wells Aff. Ex. 10.) Anthony Keel, the Mandan Trainmaster, conducted the investigation. (*Id.* at 4:19-22.) Fink, Christianson, and Carroll participated, along with their union representatives. (*Id.* at 3:10-4:15.) BNSF Division Trainmaster Sean Schneider testified as a witness. (*Id.* at 4:16-18.)

Trainmaster Schneider testified during the investigation that on February 5, 2019, he was notified by the Roadmaster that there was a damaged switch that was run through in the Jamestown yard. (*Id.* at 11:19-24.) Schneider asked the crew (Fink, Christianson, and Carroll) what had occurred once they arrived in Dilworth that same day, at which time they told Schneider they had not run through the switch, that the switch was gapped, and that they did not know how the damage occurred. (*Id.* at 12:10-19.) Schneider also reviewed the locomotive video footage, which showed that the crew had not lined the switch properly for their movement, consistent with damage to the switch. (*Id.* at 20:1-8.)

When asked whether the crew had violated any rules, Trainmaster Schneider explained that they had violated GCOR Rule 6.5 regarding shoving movements, GCOR 8.12 regarding hand-operated crossover switches, GCOR 8.15 regarding switches run through, GCOR 8.2 regarding position of switches, and finally GCOR 1.6 regarding dishonesty. (*Id.* at 21:5-23:17, 25:13-26:18; 27:24-30:3.)

9

At the end of the investigation, Fink stated that he had previously expressed safety concerns during his deposition in a co-worker's personal-injury lawsuit. (*Id*. at 85:16-87:9.) Fink inquired, in closing, "Could this investigation simply be an attempt to discredit me or retaliation of reporting these safety concerns that pose a risk to the workforce and the general public?" (*Id*. at 87:7-9.)

### F.      BNSF Dismisses Fink Pursuant to its Policy.

On April 5, 2019, following the investigation, BNSF dismissed Fink for violation of GCOR 1.6 regarding dishonesty in accordance with PEPA. (April 5, 2019 Dismissal Letter, Wells Aff. Ex. 11.) While General Manager Chad Sundem was the decision maker for Fink's dismissal, several BNSF personnel agreed with the decision to dismiss Fink, including Director of Labor Relations Stephanie Detlefsen, General Director of Transportation Craig Morehouse, Regional Vice President North Operations Rance Randle, and Terminal Manager Jacob DeMarais. Fink was dismissed because he was dishonest regarding damage to the switch on February 5, 2019. (*See* Case #14, Aaron Christianson and Michael Fink – Summary of Investigation, Wells Aff. Ex. 12.)

Chad Sundem, the General Manager of the territory Fink worked in, testified that the charges were proven at the disciplinary hearing because Fink and his crew did not factually report what occurred with their train. (Sundem Depo., Wells Aff. Ex. 13, at 42:7-43:4).  In particular, he explained that he made the decision and recommendation to terminate Fink's employment because the

investigation showed that the crew "absolutely ran through the switch." (*Id*. at 54: 1-19). Similarly, as explained by Director of Labor Relations Stephanie Detlefsen when asked what in her review of the record "tipped the scale" to a determination that Fink acted dishonestly, it was:

> Because all of them said that they stopped short of the switch. That's what they told the dispatcher, that they just came upon this damaged switch and decided to do the right thing and report it. They didn't explain that they might have been the ones to have damaged it. And the same with the trainmaster who arrived and questioned them. They said they just found it that way and stopped short of it.

> But that's not what happened at all. They didn't know that the switch was there. They got into it, stopped, and then got out of it, and then looked at it and realized it was damaged and that's when they reported it. And they acted like they—the point where they pulled up to is where they said they stopped short of. So they were dishonest, all three of them.

(April 28, 2022, Detlefsen Depo, Wells Aff. Ex. 14, at 88:4-23)

Fink and Christianson were dismissed; the student conductor (Carroll), however, was not dismissed. (*See* Correspondence Regarding Carroll, FINK_BNSF_000844 – 000848, Wells Aff. Ex. 15.) Instead, the student conductor received lesser discipline—a Serious ("Level S") suspension— because leadership felt he should be given a second chance as he was in training and following bad advice from senior employees – Fink and Christianson. (*Id*.; *see also* Chad Sundem Deposition Transcript, Wells Aff. Ex. 13 at 36:4-23; 37:19-38:4.)

**G.    Fink Appealed His Dismissal to an Arbitrator, who confirmed that Fink violated GCOR 1.6.**

Fink appealed his dismissal through the process established in his collective bargaining agreement. After submissions were made by both Fink and BNSF to a neutral arbitrator, the arbitrator reversed Fink's dismissal. (*See* Public Law Board No. 7928, Award No. 73, Wells Aff. Ex. 16.) That reversal did not condone Fink's conduct, however. As the arbitrator stated, "Carrier [BNSF] has met its burden of establishing by substantial evidence that Claimant [Fink] was not in compliance with the rule he was found to have violated, GCOR 1.6 Conduct." (*Id.*) (emphasis added). Importantly, the arbitrator "concur[red] with the Carrier that the omission of any mention of Claimant's train partially running through the switch may be considered a lack of candor which is not consistent with the applicable rule." (*Id.*)

Having found that BNSF established Fink violated Rule 1.6, the arbitrator addressed the level of discipline. (*Id.*) While noting that under PEPA dishonesty is grounds for a standalone dismissal, the arbitrator reduced Fink's discipline to a Level S and returned him to service with seniority unimpaired but without pay for the time he'd spent out of service. (*Id.*) As support for this decision, the arbitrator noted that the student conductor had received less-severe discipline and that Christianson was returned to service, without backpay, by a different arbitration board. (*Id.*) Following the arbitrator's award, Fink was required to re-train on

12

safety and operating rules, but he did not do so and subsequently resigned on October 20, 2021.

**H.    Fink's Alleged Safety Complaints and Testimony in the *Jurgens* Matter.**

Fink alleges he engaged in two forms of protected activity relevant to this FRSA proceeding. The first alleged protected activity took place two months before his dismissal.  Back on February 4, 2019, Fink allegedly told a BNSF Road Foreman of Engines he disagreed with a recent decision to apply the cold-weather brake-inspection rule for inbound locomotives.[2] Fink alleges he raised concern with this rule, but the BNSF Road Foreman of Engines didn't share his concerns. (Wells Aff. Ex. 3, at 112:2-114:11.) Supervisor Jacob Demarais testified that he told the yard master and road foreman to follow the air brake and train handling rules, but that he himself did not take any issue with how BNSF was handling the air brake issue. (*See* Wells Aff. Ex. 4 at 29:25-30:3; 35:22-25.)

The second alleged protected activity took place two to three years before Fink's dismissal.  On October 9, 2018 Fink was deposed during a co-workers' personal injury lawsuit and testified that "a year or maybe two years prior" to his

---

[2] (*See* Wells Aff. Ex. 3 at 110:18-112:15.) The Air Brake Train Handling rules, particularly Rule 102.1.2 includes a cold-weather-inspection protocol. (*See* ABTH 102.1.2 and ABTH 100.16, FINK_BNSF_000463-00464, Wells Aff. Ex. 17.) The rule states that when separating a train in temperatures below zero degrees Fahrenheit while the train is on a light grade, the crew should follow the inbound-train-inspection protocol. (*Id.*)   At Mandan, a local Yardmaster (a scheduled position) told local personnel, including Fink, to use this cold-weather-inspection protocol for inbound locomotives. (See Wells Aff. Ex. 4 at 27:8-20; 28:22-29:6).

co-worker injuring his knee, Fink had reported concerns with the steepness of ballast at a certain portion of BNSF track. (*See* Fink's Deposition Testimony in *Jurgens,* Wells Aff. Ex. 18, at 90:2-5.)

## LEGAL STANDARD

### I.   SUMMARY JUDGMENT.

A court must grant summary judgment if the moving party "shows that there is no genuine dispute as to any material fact and [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To survive summary judgment, the non-moving party must "go beyond the pleadings and . . . designate specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Beliefs, conjecture, speculation, and conclusory allegations cannot defeat summary judgment.  *Elmore v. Kelly*, 578 F. App'x 623, 624 (8th Cir. 2014). "[O]nly if there is a genuine dispute as to those facts does the court take the view most favorable to the non-moving party." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). Only facts that would affect a case outcome are material.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

### II.   THE EMPLOYEE'S BURDEN UNDER THE FRSA.

The FRSA provides that a railroad carrier may not discriminate against an employee for reporting a workplace injury or safety condition in good faith. *See* 49 U.S.C. § 20109(a)(4) and (b)(1)(A). To prevail, an employee must establish a prima facie case by showing by a preponderance of the evidence that: (1) he

engaged in a protected activity; (2) the employer knew he engaged in a protected activity; (3) he suffered an adverse action; and (4) the protected activity was a contributing factor in the adverse action. *Kuduk v. BNSF Ry. Co.*, 768 F.3d 786, 789 (8th Cir. 2014).

In the Eighth Circuit, a "contributing factor" requires evidence of "intentional retaliation prompted by [the employee's] engaging in protected activity." *Id.* at 791; *Neylon v. BNSF Ry. Co.*, 968 F.3d 724, 727 (8th Cir. 2020). A FRSA Plaintiff must prove that his or her protected activity "not only was a 'but for' cause of his injury, but was the proximate cause as well." *BNSF Ry. Co. v. United States Dep't of Labor Admin Review Bd.*, 867 F.3d 942, 949 n.2 (8th Cir. 2017). If an employee is disciplined for misconduct, the fact that the misconduct occurred in connection with a protected activity does not, without more, establish the contributing factor element of an FRSA claim. *Dakota, Minnesota & E. R.R. Corp. v. U.S. Dep't of Lab. Admin. Rev. Bd.*, 948 F.3d 940, 946 (8th Cir. 2020). It is also axiomatic that "employees cannot immunize themselves against wrongdoing by disclosing it in a protected-activity report." *Id*.

If the employee satisfies this standard, the employer will still prevail by showing by clear and convincing evidence that it would have dismissed the employee regardless of any protected activity. 29 C.F.R. § 1982.109(b). In this case, BNSF is entitled to summary judgment on both counts.

## **ARGUMENT & AUTHORITIES**

The Court should grant BNSF's Motion for Summary Judgment because Fink has no evidence that his alleged protected activity in reporting hazardous conditions was a contributing factor in his dismissal. In addition, BNSF has presented clear and convincing evidence that it would have dismissed Fink for his dishonesty in relation to the damaged switch regardless of his alleged protected activity.

In any event, Fink's punitive damage claim should be dismissed as a matter of law because he has failed to meet the prerequisites for entitlement to punitive damages.

**I.    FINK'S FRSA CLAIM FAILS AS A MATTER OF LAW BECAUSE HE CANNOT PROVE THAT HIS ALLEGED PROTECTED ACTIVITY WAS A CONTRIBUTING FACTOR IN HIS DISMISSAL.**

In order to survive summary judgment Fink "must demonstrate more than a genuine issue of material fact as to whether [he] violated workplace rules." *Richey v. City of Independence*, 540 F.3d 779, 784 (8th Cir. 2000). He must instead prove that BNSF did not actually believe "he was guilty of the conduct justifying discharge." *Scroggins v. Univ. of Minn.*, 221 F.3d 1042 (8th Cir. 2000); *see also Kuduk*, 768 F.3d at 791 ("In the absence of evidence connecting his protected activity to the discharge, plaintiff is not entitled to FRSA anti-retaliation relief even if BNSF inaccurately concluded that he committed [the rule violation].").

In numerous similar cases, the Eighth Circuit affirmed summary judgment in favor of BNSF based on an employee's failure to satisfy his burden under the FRSA. *See, e.g.*, *Neylon*, 968 F.3d at 731; *Foster v. BNSF Ry. Co.*, 866 F.3d 962, 967 (8th Cir. 2017) (affirming summary judgment in favor of BNSF where the plaintiffs did not contend the decisionmaker acted with retaliatory motive and the company's findings on the employee's violation of its rules, even if erroneous, did not constitute a cognizable FRSA claim); *Gunderson v. BNSF Ry. Co.*, 850 F.3d 962, 970 (8th Cir. 2017) (upholding the district court's grant of summary judgment on the employee's retaliation claim where the employee failed to submit evidence that would permit a reasonable jury to infer his FRSA-protected activities contributed to his dismissal); *Kuduk*, 768 F.3d at 792 (agreeing summary judgment in favor of BNSF was proper because the company's conclusion the employee violated its rules, even if based on incorrect information, did not demonstrate a prima facie case of retaliation). These decisions foreclose Fink's claims in this matter because he sets forth no admissible evidence that his alleged protective activities contributed to his dismissal.

### A. Direct Evidence Is Absent.

Although an FRSA plaintiff can rely on direct evidence, there is none here to support Fink's allegations. Direct evidence of discrimination is "a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated an adverse employment action." *Sanders v. BNSF*

*Ry. Co.*, 17-CV-5106 (ECT/KMM), 2019 WL 5448309, at *11 (D. Minn. Oct. 24, 2019) (citation omitted). Direct evidence includes "comments or statements indicating [retaliatory] intent, where those comments are made by people with decision-making authority." *Hutton v. Maynard,* 812 F.3d 679, 683 (8th Cir. 2016) (citation omitted). Routinely, there is a lack of direct evidence submitted by FRSA plaintiffs. *See Carlson v. BNSF Ry. Co.,* 2022 WL 37468, at *8-9 (D. Minn. Jan. 4, 2022) (noting that the record lacks any direct evidence that Carlson's protected activities contributed to BNSF's termination decision); *Grell v. UPRR R.R. Co.,* 2019 WL 687883, at *37-39 (D. Neb. Jan. 4, 2019) (finding there is no direct evidence that Grell's termination was caused by him engaging in protected activities).

Similarly, here, there is no direct evidence of a link between any discriminatory animus and Fink's dismissal. There are no comments or statements indicating retaliatory intent from the decisionmaker or any other type of direct evidence to support Fink's allegations.  Thus, there is no dispute of fact precluding summary judgment based on the lack of direct evidence.

### B. Circumstantial Evidence Is Absent.

Similarly, Fink has failed to put forth sufficient circumstantial evidence to support his allegations. Absent direct evidence, the Eighth Circuit considers circumstantial evidence in cases such as these. Circumstantial evidence includes "the temporal proximity between the protected activity and the adverse action, indications of pretext such as inconsistent application of policies and shifting

explanations, antagonism or hostility toward protected activity, the relation between the discipline and the activity, and the presence of intervening events that independently justify discharge." *Hess v. Union Pacific Ry. Co.*, 898 F.3d 852, 858 (8th Cir. 2018) (quoting *Loos v. BNSF Ry. Co.*, 865 F.3d 1106, 1112-13 (8th Cir. 2017)). "'The critical inquiry' for pretext 'is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying discharge.'" *Gunderson v. BNSF Ry. Co.*, 2015 WL 4545390, at *11 (D. Minn. July 28, 2015) (quoting *Weirman v. Casey's Gen. Stores*, 638 F.3d 984, 997 (8th Cir. 2011)).

> ### i. *Lack of Temporal Proximity Between Fink's Alleged Protected Activities and His Dismissal.*

There is a lack of temporal proximity between Fink's alleged protected activities and his dismissal. While "[m]ore than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation", the Eighth Circuit considers temporal proximity as one element of potential circumstantial evidence. *Kuduk,* 768 F.3d at 792; *Hess*, 898 F.3d at 858; *Neylon,* 968 F.3d at 729 (finding that the temporal proximity of plaintiff's report to his punishment, without more, does not show intentional retaliation). "In a retaliation case, [a] gap in time between the protected activity and the adverse employment action weakens an inference of retaliatory motive." *BNSF Ry. Co.,* 867 F.3d at 945. For example, in *Smith-Bunge*

*v. Wis. Cent., Ltd.,* the Eighth Circuit determined that a six-day gap between the alleged protected activity and the adverse employment action was insufficient to infer animus or intentional retaliation. 946 F.3d 420, 424 (8th Cir. 2019).

In this case, while Fink alleges he engaged in protected activity by reporting safety concerns through his testimony in the *Jurgens* matter, there is a lack of temporal proximity between his testimony and his dismissal. Fink's deposition in the *Jurgens* matter occurred on October 1, 2018, during which he testified to reporting a safety concern one or two years *prior to* August 7, 2017. (*See* Wells Aff. Ex. 18, at 90:2-5.)  Fink was dismissed on April 5, 2019. (*See* Wells Aff. Ex. 11.) Thus, Fink's alleged safety concern which he testified to reporting in 2015 or 2016 is far too remote from his April 5, 2019 dismissal to establish temporal proximity. *Cf. Smith-Bunge*, 946 F.3d at 424.

Moreover, Fink's alleged safety concern regarding the inbound inspection rule was expressed on February 4, 2019, more than *two months* before his termination. (*See* Wells Aff. Exs. 3 and 11.) Here too, as in *Smith-Bunge*, the temporal proximity necessary to support circumstantial evidence of retaliatory conduct is lacking. 946 F.3d at 424. Fink is unable to provide circumstantial evidence that his alleged protected activity was a contributing factor to his dismissal because his protected activity was not temporally proximate to his dismissal.

In sum, Fink cannot demonstrate temporal proximity between his alleged protected activity and his dismissal.  Even if he could make this showing, he must

prove more than temporal proximity to survive summary judgment.  Indeed, even in cases in which an employee established temporal proximity, the Eighth Circuit affirmed the grant of summary judgment in BNSF's favor.  *See, e.g.*, *Neylon*, 968 F.3d at 729.

> ii.  *Lack of inconsistent application of policies and shifting explanations.*

Fink is unable to prove BNSF misapplied or inconsistently applied its discipline policy to establish the requisite circumstantial evidence to support his claims. *See Hess*, 898 F.3d at 858; *see also Carlson,* 2022 WL 37468, at \*4 (finding that BNSF did not shift its explanations where, even where BNSF debated which rules to charge a violation of).

As an initial matter, Fink cannot deny that BNSF had ample evidence that he was dishonest – this was affirmed by the video footage, by a BNSF decisionmaker, and lastly by the neutral arbitrator on appeal. (*See* Wells Aff. Exs. 5, 11, 12, and 16.) BNSF cited dishonesty as one of the allegations in its initial investigation letter to Fink, among others. (Wells Aff. Ex. 9.) Fink's dishonesty was the stated purpose of the formal investigation hearing and the ultimate reason BNSF dismissed him in April 2019. (Wells Aff. Exs. 9 and 11.) The evidence shows that BNSF's explanation for its discipline remained consistent with respect to Fink.

BNSF anticipates that Fink may argue that because Carroll was not terminated as a result of the February 5, 2019 incident, BNSF inconsistently

applied its policies. BNSF granted Carroll lenience as he was still in training at the time of the incident and followed unfavorable guidance from senior employees. (*See* Wells Aff. Ex. 15; Wells Aff. Ex. 13 at 37:19-38:4.) BNSF provided a reasonable and thorough explanation for its leniency for Carroll which focused solely on his status as a student and had nothing to do with Fink's alleged protected activity. (*Id*.) Moreover, the fact that BNSF was lenient with Carroll, an inexperienced student conductor, while electing to terminate the more-experienced Fink and Christianson is not evidence of disparate treatment between similarly situated employees. The Eighth Circuit has held that while instances of disparate treatment may support a claim of pretext, the comparators must be "similarly situated in all relevant respects." *Torgerson v. City of Rochester*, 643 F.3d 1031, 1051 (8th Cir. 2011); *see also Gunderson*, 850 F.3d at 970 (concluding the Plaintiff was not similarly situated to another employee who voiced safety concerns because the nature of obstreperous behavior leading to dismissal was not the "same degree of severity.") Here, Fink and Carroll were not similarly situated in all relevant respects because Fink was substantially more experienced than Carroll, and more familiar with railroad operations and procedures. *See Fields v. Shelter Mut. Ins. Co.*, 520 F.3d 859, 864 (8th Cir. 2008) (holding employees were not similarly situated where they had varying levels of experience). Any argument that BNSF's grant of leniency to Carroll is circumstantial evidence of retaliatory conduct toward Fink ignores the practical and reasoned explanation BNSF gave for its leniency.

In sum, there is no admissible evidence suggesting that BNSF shifted its explanations with respect to Fink's discipline, or inconsistently applied its policies.

### iii.    Lack of antagonism or hostility toward protected activity.

In addition, there is no evidence that any of the BNSF personnel who were involved in Fink's case had any "antagonism or hostility" toward Fink's alleged protected activity. *See Neylon,* 968 F.3d at 730 (dismissing plaintiff's claim that BNSF has a "culture of retaliating against employees who report injuries" where plaintiff failed to identify evidence that any incentive motivated the BNSF employees who dismissed him). More specifically, Fink has no evidence to support that the decision maker, Chad Sundem, had any antagonism or hostility toward any of Fink's alleged protected activities. (*See* Wells Aff. Ex. 13)

While Fink alleges vaguely that Sean Schneider may have shown hostility or antagonism toward him, Fink's testimony reveals that any antagonism or hostility was not in relation to any alleged protected activity, but rather alleged annoyance that Fink called Schneider late at night regarding a question he had. (*See* Wells Aff. Ex. 3.) More importantly, it is undisputed that Schneider did not participate in the decision to dismiss Fink. (*See* Wells Aff. Exs. 10, 11, and 12.) Similarly, in *Logsdon v. BNSF Railway Co.*, 262 F.Supp.3d 895, 903 (D. Neb. 2017), the court granted summary judgment in favor of BNSF on the employee's FRSA claims based, in part, on the fact the BNSF representatives the employee challenged for allegedly engaging in nefarious conduct were not the decision

makers who terminated the employee.  As is the case here, the decision makers in *Logsdon* dismissed the employee for dishonesty after a thorough investigation. *Id*. Regardless of whether that decision was correct, the court dismissed the employee's FRSA claims because there was no evidence the decision was made in bad faith or that it was motivated by discriminatory animus.  *Id.* at 904*; see also Carlson,* 2022 WL 37468, at *5-6 (finding antagonism and hostility from employees who were *not* involved in the termination decision irrelevant). Because Fink cannot demonstrate that any BNSF personnel who were involved in his case acted with hostility or antagonism toward his alleged protected activity, Fink's claims must be dismissed.

> iv.     *Lack of relation between discipline and the protected activity.*

Fink is likewise unable to show any relationship between the discipline he received and his alleged protected activity. Fink's dismissal related to dishonesty regarding running through a switch. (*See* Wells Aff. Exs. 9 and 11.) Fink's discipline was not related in any way to air brake/train handling rules in the Jamestown yard or steep ballast. "[I]f the discipline was wholly unrelated to the protected activity . . . whether it was fairly imposed is not relevant to the FRSA causal analysis." *Gunderson,* 850 F.3d at 969. Thus, Fink's claims also fail in this respect.

> v. *Presence of intervening events that independently justify discharge*

Lastly, due to the presence of intervening events that independently justify Fink's dismissal – in this case, Fink's dishonesty with respect to the damaged switch – Fink is unable to present circumstantial evidence of retaliatory conduct. "Causal connection may be severed by the passage of a significant amount of time, or by some legitimate intervening event." *Gunderson,* 850 F.3d at 969 (quoting *Feldman v. Law Enf't Assocs. Corp.,* 752 F.3d 339, 348 (4th Cir. 2014)); *see also Smith-Bunge,* 946 F.3d at 424 (finding that a crash between the protected activity, which was wholly unrelated to the crash, and termination was "an intervening event that independently justified" termination).

In this case, both Fink's testimony in the *Jurgens* matter and his alleged complaint regarding the air brake and train handling rules occurred before the February 5, 2019 incident involving his dishonesty regarding the damaged switch. (*See* Wells Aff. Exs. 3 and 18.) Fink's dishonesty independently justifies his discharge, per the PEPA Policy, and therefore severs any alleged causal connection between Mr. Fink's alleged protected activity and his dismissal. *See Kuduk*, 768 F.3d at 792 (concluding the employee's rule violation was an intervening event that independently justified adverse disciplinary action).

The "[c]ritical inquiry for pretext 'is not whether the employee actually engaged in the conduct for which he was terminated, but whether the employer in good faith believed that the employee was guilty of the conduct justifying

discharge.'" *Gunderson,* 850 F.3d at 969 (quoting *McCullough v. Univ. of Ark. For Med. Scis.,* 559 F.3d 855, 861-62 (8th Cir. 2009)). In this case, the evidence presented shows that the BNSF decision makers at issue believed in good faith that Fink had been dishonest. Because dishonesty is a stand-alone dismissible violation per the PEPA Policy, and Fink has failed to present any direct or circumstantial evidence that BNSF violated the FRSA, Fink's FRSA claim fails as a matter of law. *Kuduk*, 768 F.3d at 791. Moreover, Fink should not be allowed to "immunize" himself from the disciplinary process resulting from his dishonesty by inserting claims of protected activity in his disciplinary hearing. *Dakota, Minnesota & E. R.R. Corp.*, 948 F.3d at 946.

## II.   BNSF WOULD HAVE TAKEN THE SAME ACTION REGARDLESS OF ALLEGED PROTECTED ACTIVITY.

Even if Fink could establish that there is a genuine issue of material fact regarding whether his alleged protected activities contributed to his dismissal, BNSF is still entitled to summary judgment because it has produced clear and convincing evidence that it would have dismissed Fink despite his alleged protected activities. Even if Fink meets his burden under FRSA, BNSF may avoid liability if "it demonstrates, by clear and convincing evidence, that it would have taken the same unfavorable personnel action in the absence of [plaintiff's protected activity]." *BNSF Ry. Co.,* 867 F.3d at 945; *Dafoe v. BNSF Ry. Co.*, 164 F.Supp.3d 1101, 1108 (D. Minn. 2016) (citing *Kuduk*, 768 F.3d at 789 and 49 U.S.C. § 42121(b)(2)(B)(i)). *Dafoe* set forth a list of seven (7) non-exclusive

factors for assessing whether BNSF has made such a clear and convincing showing:

> (1) whether the railroad has written policies addressing the alleged misconduct; (2) whether the railroad followed applicable investigatory and disciplinary procedures; (3) whether the dismissal was "approved by others in senior management,"; (4) whether the dismissal was upheld on appeal; (5) the "temporal proximity between the non-protected conduct and the adverse actions,"; (6) whether the railroad consistently enforces the policies and rules at issue; and (7) "the independent significance ... of the non-protected activity.

*Dafoe*, 164 F.Supp.3d at 1115-16 (citations omitted). As demonstrated through its analysis below, BNSF has furnished more than sufficient evidence that it would have dismissed Fink regardless of his alleged protected activity.

### A. BNSF Has Written Policies Addressing Dishonesty.

Both the GCOR and PEPA Policy are written, clear, and concise policies regarding prohibited behavior – in this case dishonesty – and its consequences. GCOR 1.6 states that employees must not be dishonest and states that any act of hostility, misconduct, or willful disregard or negligence affecting the interest of the company or its employees is cause for dismissal. (Wells Aff. Ex. 1.) Likewise, the PEPA provides that "[d]ishonesty about any job-related subject" is a stand-alone dismissible rule violation. (Doc. No. 19-2.)

Fink violated Rule 1.6, as demonstrated through the video footage, investigation, and subsequent appeal, by failing to accurately report that the locomotive at issue caused damage to the switch in the Jamestown yard. (*See* Wells Aff. Exs. 5, 10, and 16.)

BNSF has demonstrated that it has uniformly applied its policy regarding dishonesty by dismissing several other employees for similar rule violations. First, it dismissed conductor Christianson, a similarly senior BNSF employee involved in the February 5, 2019 incident, for dishonesty. (*See* Wells Aff. Ex. 11.) This independently demonstrates that BNSF did not act with discriminatory animus, as Christianson had not engaged in any protected activity.

Second, BNSF has demonstrated that it consistently dismissed employees alleged to have violated GCOR 1.6 relating to dishonesty. (*See* Comparator Chart, Wells Aff. Ex. 19.) BNSF conducted a search of employees in the Twin Cities Division from March 2016 – March 2019 in train service who were alleged to have violated Rule 1.6 relating to dishonesty. (*Id.*) Each employee charged with such a violation, except those exonerated or those who resigned prior to discipline, was dismissed except for Carroll. (*Id.*) As discussed above, BNSF felt Carroll deserved a second chance due to being in training during the February 5, 2019 incident and following the lead of Christianson and Fink. (Wells Aff. Ex. 15.) The remainder of Rule 1.6 violations resulting in dismissal demonstrates consistent and uniform application of BNSF's policy regarding dishonesty.

## B. BNSF Followed Applicable Investigatory and Disciplinary Procedures.

It is undisputed that BNSF followed applicable investigatory procedures from the CBA, as well as disciplinary procedures found in the PEPA Policy. The appropriate investigatory procedures, including providing notice of an alleged rule

violation and allowing representation at the investigation were followed by BNSF. (*See* Wells Aff. Ex. 2.) Fink was provided written notice of his violation, had the opportunity to present witness, offer evidence, and to question BNSF witnesses at the investigation, and was issued a prompt decision. (*See* Wells Aff. Exs. 2, 10, and 11.) Similarly, there has been no allegation that BNSF did not follow its own disciplinary procedures. The decision maker reviewed multiple sources including the investigation transcript and associated exhibits prior to his decision to terminate Fink. (*See* Wells Aff. Ex. 10.)  Under these circumstances, summary judgment is appropriate because Fink cannot show "BSNF's decision-making process, even if flawed, would have come out differently in the absence" of the alleged protected activity.  *Kuduk*, 768 F.3d at 793.

### C. BNSF Senior Management Approved of Fink's Dismissal.

As demonstrated throughout correspondence regarding discipline for Fink, Christianson, and Carroll, BNSF senior management ultimately approved Fink's dismissal. Initially, Stephanie Detlefsen reviewed the record and recommended a standalone dismissal of Fink on the basis of dishonesty. (Wells Aff. Ex. 15.) Similarly, Chad Sundem agreed with dismissing Fink on the basis of dishonesty. (*Id.*)

### D. Fink's Rule Violation Was Upheld on Appeal Despite the Arbitrator Changing the Level of Discipline.

While the level of discipline assessed to Fink by BNSF – dismissal – was not upheld on appeal, Fink's rule violation was. (*See* Wells Aff. Ex. 16.) The

arbitrator found that BNSF had "met its burden of establishing by substantial evidence that Claimant [Plaintiff] was not in compliance with the rule he was found to have violated, GCOR 1.6 Conduct." (*Id*.) The arbitrator "concur[red] with the Carrier that the omission of any mention of Claimant's train partially running through the switch may be considered a lack of candor which is not consistent with the applicable rule." (*Id*.) Moreover, the arbitrator agreed that under PEPA dishonesty is grounds for a standalone dismissal, but reduced Fink's discipline to a Level S. (*Id.*) Nonetheless, it is telling and instructive that Fink's rule violation, and some level of discipline, was upheld on appeal.

### E. BNSF Promptly Investigated Fink's Dishonesty and Rendered its Dismissal Decision.

Not only did BNSF conduct a thorough, fact-based investigation into Fink's dishonesty, its investigation and subsequent dismissal were handled in a prompt fashion following Fink's rule violation.  Fink received a notice of investigation on February 14, 2019, less than ten days after his rule violation. (*See* Wells Aff. Ex. 9.) The associated investigation was held just over one month later, on March 21, 2019. (*See* Wells Aff. Ex. 10.) After reviewing the investigation, BNSF promptly dismissed Fink and Christianson on April 5, 2019. (*See* Wells Aff. Ex. 11.) BNSF's prompt investigation and dismissal determination demonstrates it would have dismissed Mr. Fink regardless of his alleged protected activity.

### F.  Independent Significance of Non-Protected Activity.

Dishonesty is not a protected activity and is taken very seriously by BNSF as demonstrated by the fact that it is the second item on a list of Stand-Alone Dismissible Violations. (Doc. No. 19-2.) In addition, BNSF demonstrates its prohibition of dishonesty and its consequences by consistently dismissing employees who are dishonest. (Wells Aff. Ex. 19.) The independent significance of Fink's dishonestly is shown throughout his disciplinary process.

**G. BNSF has no Practice of Disciplining Employees who Report Safety Concerns, as Evidenced by Multiple Employees who Reported Safety Concerns in Mandan, North Dakota and Faced No Discipline.**

Fink's claims of retaliation for reporting safety concerns are not supported by the facts.  BNSF's employees in its Mandan, North Dakota facility routinely report perceived safety concerns and there is no pattern or practice of those employees being subjected to discipline.  For example, in the discovery phase of this case BNSF reviewed Meeting Minutes from employees who participated in a Safety Committee, where scheduled and exempt employees regularly meet to discuss safety concerns with their railroad workplace. (*See* Mandan Safety Committee Meeting Minutes, Wells Aff., Ex. 20.)  BNSF then reviewed the employee transcripts and disciplinary history of these employees.  (*See* Safety Committee Participants' Employee Transcripts and Disciplinary History, at Wells Aff., Ex. 21).  Of the nineteen employees who reported safety concerns at these meetings, only one employee was assessed discipline for a rule violation within a one-year period after raising safety concerns.  (Compare Wells Aff. Exs. 20 and

21.)  Moreover, another employee actually voiced concerns with poor walking in conditions along a track—the same type of safety complaint Fink alleges he raised when testifying in the *Jurgens* matter—and this employee was not subjected to any workplace discipline.  (*See* Wells Aff. Ex. 20 at January 9, 2018, and Transcript of C. Koster, Wells Aff. Ex. 22.)

In sum, BNSF has put forth significant evidence demonstrating that it would have dismissed Fink from employment despite his alleged protected activity. On this basis, BNSF requests the Court grant its Motion for Summary Judgment and dismiss Fink's claims as a matter of law.

## III.   ALTERNATIVELY, FINK'S CLAIMS FOR PUNITIVE DAMAGES SHOULD BE DISMISSED.

The FRSA permits punitive damages up to $250,000. Although the standard is not set forth by statute, courts have determined that punitive damages are only available in the FRSA context when an employer acts with reckless or callous disregard for the plaintiff's rights or intentionally violates federal law. *BNSF Ry. Co. v. United States Dep't of Labor*, 816 F.3d 628, 642 (10th Cir. 2016). Punitive damages are not available when a defendant demonstrates it made a good-faith effort to comply with the FRSA.  *BNSF Ry. Co.*, 867 F.3d at 949; *see also Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 543 (1999); *Bennett v. Riceland Foods, Inc.*, 721 F.3d 546, 553 (8th Cir. 2013).

BNSF has numerous rules and processes to prevent discrimination or retaliation against whistleblowers. (*See* Wells Aff. Exs. 1 and Doc. No. 19-2.) In

addition, BNSF operates a 24-hour hotline managed by a third-party for employees to report concerns and encourages employees to do so by prohibiting retaliation against whistleblowers. Such policies demonstrate good-faith compliance with the FRSA and thus prohibit any punitive damages claim. *BNSF Ry. Co.*, 867 F.3d at 949 (similar evidence "is strong evidence of BNSF's good-faith efforts to prevent retaliation.").

Because Fink's claims should be dismissed as a matter of law, as discussed in greater depth above, Fink's punitive damage claim should also be dismissed. *See Whitney v. Red River Valley & W. R.R. Co.,* 2017 WL 10316145, at *7 (D.N.D. Nov. 2, 2017) (dismissing plaintiff's punitive damages claim when summary judgment was granted for defendant railroad as to plaintiff's FRSA claim because only the prevailing party may recover punitive damages). However, even if the Court does not grant BNSF's Motion for Summary Judgment in its entirety, it should still dismiss the punitive damages claim based on the foregoing.

## **CONCLUSION**

BNSF respectfully requests this Court grant its Motion for Summary Judgment in the entirety.

Dated: <u>April 27, 2023</u>             HAWS-KM, P.A.

                              <u>*/s/ R. John Wells*</u>
                              Daniel A. Haws, MN #193501
                              (Admitted to ND Federal Court)
                              R. John Wells, ND #07726
                              Attorneys for Defendant
                              BNSF Railway Company
                              30 East Seventh Street, Suite 3200
                              St. Paul, MN 55101-4919
                              Tel. (651) 227-9411
                              dhaws@hkmlawgroup.com
                              jwells@hkmlawgroup.com

                              And

                              **Ohnstad Twichell, P.C.**

                              <u>/s/ Andrew D. Cook</u>
                              Andrew D. Cook, ND ID#06278
                              444 Sheyenne St., Suite 102
                              West Fargo, ND 58078-0458
                              Tel.   (701) 282-3249
                              Fax.   (701) 282-0825
                              Email: acook@ohnstadlaw.com

4895-5373-5262, v. 1