UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| Michael Fink, | Court File No. 1:20-CV-222 DLH-CRH |
| Plaintiff, | |
| vs. | **MEMORANDUM IN OPPOSITION TO BNSF'S MOTION FOR SUMMARY JUDGMENT** |
| BNSF Railway Company, a corporation, | |
| Defendant. | |

## INTRODUCTION

Since Wall Street took them over, railroads have put productivity ahead of safety. For examples of the consequences of this approach to railroading, one need look no further than what is happening right now in East Palestine, Ohio or Raymond, Minnesota or Dacus, Texas. People are being killed, towns are being evacuated, rivers are being poisoned, all in the name of profit.

There are employees at the railroads who have tried to stop this trend. The railroads view them as liabilities. People who should be eliminated from the ranks.

This includes Michael Fink, who was an engineer for BNSF Railway Co. for almost a decade. When BNSF began putting productivity ahead of safety, he objected. He objected to management. He objected to the federal government.

Fink's refusal to get with BNSF's new program caused friction between him and management. But there wasn't much his managers could do about it. Pursuant to BNSF's collective bargaining agreement with Fink's union, Fink could not be terminated without cause. Fink is an excellent railroader, to the point he never gave anything to his managers that they could use to justify terminating him.

For reasons that have nothing to do with him, that changed on February 5, 2019, when the crew with whom he was working told him that they had discovered a damaged section of track. It is not at all clear whether the track was already damaged or whether Fink's crewmates caused the damage. But it doesn't really matter for purposes of this case. That's because it is undisputed that, regardless of who caused the damage, Fink had no culpability for it.

After his crewmates told him about the damage, Fink did exactly what he should have done, relayed his crewmates' report to BNSF. They had told Fink that they were not responsible for the damage, and Fink relayed that message to BNSF. The manager to whom Fink made the report seemed unsurprised by Fink's report. He told Fink that he suspected another crew in the area had damaged the track, and Fink thought nothing more of it.

That should have been the end of the story; however, Fink then talked to that manager about an unrelated safety concern, one that had recently become a matter of great contention between Fink and his managers. The manager then did an about face, accusing Fink of numerous rule violations related to the damaged track, including lying about who had damaged the track, and BNSF terminated Fink on the basis of these accusations. This despite BNSF knowing that Fink had no reason whatsoever to lie about who damaged the track, despite Fink having only relayed what he had been told by his crewmates, despite Fink having been a model employee.

From these facts, a reasonable conclusion is that BNSF's real reason for terminating Fink was his safety reports and not anything having to do with the damaged track. Indeed, that is probably the most reasonable conclusion. And this type of retaliation is exactly what is prohibited by the Federal Railroad Safety Act (FRSA).

Nevertheless, BNSF has asked the Court to throw out Fink's case. The arguments BNSF makes in support of its request, however, crumble under scrutiny. They rely on cherry-picked facts and ignore relevant context.

For example, BNSF argues that it could not have retaliated against Fink because an internal hearing was held, the transcript from that hearing was forwarded to the decision makers, who knew nothing about Fink's safety reports, and they made the decision based solely on that transcript. BNSF ignores that Fink's managers had discretion regarding whether and with which rule violations to charge Fink with, and Fink could not have been terminated had they not charged him with the rule with which they charged him. BNSF ignores that the hearings are a kangaroo-court process that always result in the accusations being sustained, meaning that it was the decision of managers who charge an employee with a rule violation that really matters and not the pro forma downstream happenings. Finally, BNSF ignores that Fink's managers were the only witnesses who testified against Fink in the internal hearing, the transcript from which BNSF's argues was the basis for the decision makers' decision.

Simply put, it cannot be seriously argued that BNSF would have terminated Fink absent the involvement of his managers. They knew about his safety reports, and a reasonable person could find that Fink's safety reports were the real reason they charged him with rules violations with which they charged him and testified the way they did in his internal hearing. Such a finding would be a finding that BNSF has violated the FRSA.

BNSF's motion for summary judgment should be denied.

## FACTS

### I.    Fink was model employee

BNSF hired Fink on August 19, 2013. (Ex. A, Fink Depo. at 23.) During his career, he has worked as a conductor and an engineer. (Ex. B, Fink Employee Transcript.) Generally speaking,

engineers drive the train, and conductors navigate for the engineer. Because trains can be a mile long, meaning the engineer can't see most of it, they rely heavily on what the conductor tells them. (Ex. D, Booke Depo. at 88-89.) The conductors are the engineer's eyes and ears.

Before the events giving rise to this litigation, Fink had never given BNSF justification to discipline him. (Ex. C, Detlefsen Depo. at 99.) The local chairman of Fink's union, Cordell Booke, considered Fink to be a known safety advocate who "was really good at reporting safety concerns." (Ex. D, Booke Depo. at 46-47.) Fink was known to have made complaints about poor walking conditions at BNSF's Jamestown Yard and to have been among the first to report issues with trains braking systems in Winter 2019. (Ex. D, Booke Depo. at 93-95.)

## II.   Fink's supervisors, Sean Schneider and Jacob Demarais, were hostile to Fink's safety complaints.

### a.   Fink's safety complaints were about trains not entering emergency braking.

Fink made complaints regarding BNSF's outbound inspection protocol, which became a contentious issue between management and him.  During the Winter of 2017 to 2018, BNSF began to experience a problem where a valve within the locomotives failed causing trains to not properly enter their emergency braking application. (Ex. X, Demarais Depo. at 24-25; Ex. O Schneider Depo. at 76-77.) This poses a hazard to the public as crews are unable to stop trains that suddenly encounter people, vehicles, animals, or other objects on the track. (Ex. A, Fink Depo. at 111.)

Fink testified that the change implemented by BNSF would cause a train to "only partially go into emergency instead of completely going into emergency, which is an unsafe condition." (*Id*. at 134.) To address it, BNSF instructed crews to bring down the air that is stored in trains to allow braking to occur to zero before departing the yard. (Ex. D, Booke Depo. at 49-50.) Fink immediately pressed back on that solution because it only masked the problem. (*Id*. at 50; Ex. A, Fink Depo. at 105-106.) His solution—which happens to be established protocol—would have

cost more time and consequently increased the dwell time of trains sitting in yard, which would have cost the railroad money because freight would sit in yards longer. As a result, crews were instructed to use the carrier's solution and not take the safer, albeit slower, course. (Ex. D, Booke Depo. at 117.) This a critical safety issue as it is unknown if the braking system for miles-long trains are functioning properly and is also described in memorandum from the SMART-TD union. (Ex. P, Smart TD Memos.)

Concerned for his and others' safety, Fink made complaints on February 5, 2019, February 10, 2019, and February 16, 2019, regarding the train's failure to enter emergency braking.

The February 5, 2019 complaint was made to Sean Schneider and Road Foreman of Engines Selzer on the night that BNSF has used to justify terminating Fink. During his deposition, Fink testified that he raised concerns regarding trains not entering emergency braking with Schneider. Initially, Schneider deflected to Selzer and Fink insisted on calling him regarding his concerns:

> I explained to him my concerns about it being a safety issue because crews will not know if their train is properly going into emergency braking or not when they leave the yard by following that procedure which is designated specifically to be an inbound inspection, not an outbound inspection.

(Ex. A, Fink Depo. at 112.)

On February 10, 2019, Fink was on a coal train and "there was a defective brake valve in the train that resulted in all the cars ahead of that car not going into emergency versus all of the cars going into emergency like would happen in a proper emergency braking instance." (Ex. A, Fink Depo. at 134-37.) Fink reported the incident to the dispatcher, Selzer, and the Federal Rail Administration (FRA). (*Id*. at 136.) As described in a memorandum commemorating the event, the coal train "broke in two" because the "rear portion of the train went into emergency and the head end did not and kept going on down the rail." (Ex. P, Smart TD Memos.) Importantly, this

report was made before Fink was accused of the rule violations BNSF used to justify his termination.

On February 16, 2019, Fink for a third time raised the emergency braking issue with a yardmaster, telling the yardmaster that he would "be happy to set out the cars that weren't functioning properly." (Ex. A, Fink Depo. at 119.) Instead, the "yardmaster spoke with the trainmaster who instead pulled us off the train and put another crew on the train who was told the train was good to go and took it out of the yard." (*Id*.) As described in a memorandum commemorating the event, this event highlighted the highly unsafe nature of BNSF's masking of the problem; that train crews, management, and the public have no idea if the braking system for an entire train is working because BNSF was trying to mask the problem in the name of moving freight more quickly.  (Ex. P, Smart TD Memos at 2.)

### b. Fink repeatedly made complaints about unsafe walking conditions to management and testified about those conditions in federal court

Fink also made complaints about unsafe walking conditions. Safe walking conditions are an important part of railroad safety, especially for conductors. As part of their duties, conductors must leave the cab[1] to walk along the track to provide what is known as "point protection" where they serve as the engineer's eyes and ears and help guide the train. (Ex. A, Fink Depo. at 64-65.) When improper ballast (rock) is used along the track, the ballast is too steep, or holes are present in the walkways, the tracks are considered hazardous because conductors could injure themselves performing routine duty. (Ex. G, Fink *Jurgens* Depo. at 139-140.)

Relevant to this case, Fink testified in *Jurgens v. BNSF Ry. Co.*, 1:17-cv-00179-BRW-CRH (D. N.D. 2019), an FELA case involving employee injuries because of unsafe walking conditions.

---

[1] The cab is the area where the train's controls are and where the engineer and conductor sit.

(*Id*.) In that case, Fink identified a variety of problems with the ballast that injured Cary Jurgens, one of his co-workers. Fink's testimony was:

- His testimony was that the ballast at Jamestown Yard is steep and there are no walkways for crews. (Ex. G, Fink *Jurgens* Depo. at 89.) As a result, crews "typically walk with one foot higher than the other which is an unnatural way to walk." (*Id*. at 139.) The steep ballast also is prone to "slip out from under you more if there's more grade." (*Id*. at 140.)

- Crews requested a "shoving platform," a utility vehicle, or a PTI van to prevent the need to walk along the steep ballast, but supervisor Sean Schneider refused and told the crew to walk the three and a half miles on the steep ballast to service the Strata Industry. (*Id*. at 58-61.)

### c.  Fink's supervisors were hostile toward his safety complaints

Booke testified that Demarais "was always upset when the FRA would be contacted because he always felt it had to go right through him first" but instead of resolving the problem Demarais would "try to sweep it under the rug . . ." (Ex. D, Booke Depo. at 96.) Booke explained that Demarais was hostile to the complaints because it meant that trains were not moving out of the yard as quickly as he wanted.  (*Id*. at 95.)  Demarais himself testified that he needed to be "honest" and that he spoke with members of the safety team about making the complaints to the FRA and told them to go through him or other management first. (Ex. X, Demarais Depo. at 34-36.)

Fink's direct supervisor was Sean Schneider who oversaw "the Jamestown subdivision which is mainline on the coal route." (Ex. F, Schneider PMP.) The two were known not to see "eye-to-eye," and Schneider exhibited "some animosity" toward Fink over his complaints regarding walking conditions and train handling issues. (Ex. D, Booke Depo. at 98.) Booke testified that the problems between the two came from "the walking conditions at Jamestown since at the time Mr. Schneider was trainmaster on the territory. . ." (*Id*. at 98.)

Booke's testimony is corroborated by Schneider's 2018 mid-year and end-year Performance & Development Reviews.  His self-review notes his efforts to work with "with BNSF claims and BNSF legal team in connection with . . . employee injuries or incidents . . . to protect company assets and minimize potential company liability." (Ex. F, Schneider 2018 PMPs.) Those efforts were directly impacted by Fink's testimony in the *Jurgens* litigation. What is more, Schneider also boasted about his position as a "safety leader" in the "Slip, Trip, Fall team." (*Id.*) As a FRA reportable FELA injury, Cary Jurgens injury falling on ballast that slipped from underneath him would have directly impacted Schneider's performance in that role. (*Id.*)

**d.  BNSF warns Fink to not testify adversely against it in *Jurgens***

Before his deposition in *Jurgens*, BNSF ordered him to meet with Anton Freidig, a manager in BNSF's claims department, and an attorney for BNSF.  (Ex. A, Fink Depo. at 90.) During that meeting, BNSF and its attorney inquired whether Jurgens "injured himself before he came to work that day." (*Id*. at 94.) When Fink told the attorney and Freidig that he "didn't see any sign of that," they told Fink that it would "really help [BNSF's case against Jurgens]" if Fink had seen evidence that the injury occurred off-duty. (Fink. Depo. at 94.)[2] When Fink refused to lie for the benefit of the company, the attorney "immediately asked [Fink] if [he] enjoyed working for BNSF." (*Id*.) Although he was now scared for his job, Fink testified truthfully at his deposition in Jurgens.

**III.  BNSF knew Fink was not culpable for the incident it used to justify terminating him**

Not long after his deposition, on February 5, 2019, Fink was involved in the incident that BNSF used to justify terminating him. BNSF did so despite it being obvious that Fink had little to no culpability for the incident.

---

[2] Fink later testified to the same exchange at trial in *Jurgens*.

    **a. Engineers cannot see behind their train when moving backwards and therefore rely on their conductors to be their eyes and ears**

Conductors and engineers are not similarly situated with respect to shoving movements, a process where a train moves cars backwards on track. Everyone agrees that a conductor is the engineer's "eyes and ears" during shoving movements. (Ex. E, Fink Invest. Tr. at 49; Ex. DD, Keel Depo. at 62-63; Ex. O, Schneider Depo. at 28; Ex. D, Booke Depo. at 104; Ex. X, Demarais Depo. at 44.) Both conductors were asked at the company discipline hearing whether Fink relied upon them for his information during the movement and subsequent report to the dispatcher and both agreed. (Ex. E, Fink Invest. Tr. at 64 (Carroll) 68-69 (Christianson.)

This is known as protecting the shove. It is not only accepted practice and incorporated into BNSF's own rules, but it is mandated by federal law through the FRA. Specifically, 49 C.F.R. § 218.99(b) requires that conductors provide point protection and direct the movement of a train when performing such operations.

That is true because conductors oversee "most of the operation of the train from the beginning to end, such as picking up cars, doing the work on the ground, lining switches, . . . making moves, [and is] just kind of a backup set of eyes for the engineer." (Ex. D, Booke Depo. at 88.) The engineer "actually runs the locomotive and the train." (*Id.* at 89.) Booke went on to explain that:

> [D]uring switching operations, you know, [an] engineer can't see what's actually going on much beyond the locomotive. So you're either looking at hand signals or listening to the radio, and [the] conductor will give you the instructions on how far to move and what tracks you're going into or coupling up to cars.

(*Id.*) Put another way, the conductor ensures that the train is safe to move before the engineer puts it into motion because they are the only ones that can see what is on the track in the direction of movement. Engineers must start, stop, and follow the directions of the conductor in such a situation, as required by federal law. 49 C.F.R. § 218.99(b).

**b. BNSF knew that Fink, as the engineer, could not have been culpable for any rule violations.**

On the day at issue in this case, Fink was on duty with two conductors – Aaron Christianson and Daniel Carroll. Christianson and Carroll were experienced conductors. Christianson had over 4 years of experience. (Ex. BB, Christianson Employee Transcript.) Although Carroll was still classified as a trainee, he had over a year of experience and was finishing qualifying on BNSF's Jamestown Subdivision. (Ex. Z, Carroll Transcript.)

While at Jamestown Yard, the crew had a safety briefing and then "cut away the locomotive consist which . . . was five locomotives and started [their] first move." (Ex. A, Fink Depo. at 61-62.) This forward movement was done without point protection because Fink—the train's operator and engineer—could see out the window. (*See Id.* at 63-64.) Fink's conductors, Christianson and Carroll, were both outside of the cab during the first movement. (*Id.* at 63.)

Once the first movement was finished, Carroll radioed Fink and "said that he was on the point protecting the shove, which means he's riding the locomotive, and to bring them back 20 cars." (*Id.* at 65.) Fink, still in the locomotive cab, had to reverse 20 cars, which were approximately 50 feet in length each, meaning he was over 1,000 feet from the back of the train. (Ex. A, Fink Depo. at 65.) Fink could not see the end of the train or his conductors riding the point. (*Id.* at 66.) As a result, the crew was relying on radio communication instead of hand signals, as required by 49 C.F.R. § 218.99(b). (*Id.*)

Fink testified that he only reversed "a few cars and Conductor Christianson called over the radio for a stop" so he stopped the train." (Ex. A, Fink Depo. at. at 67.) Christianson then asked him to pull forward a car length, so he did. (*Id.*) Fink awaited the next instruction, but it did not come for some time. (*Id.* at 67) Eventually, Fink looked out the conductor's rearview mirror and

saw Christianson and Carroll walking toward the front of the train with one of the conductors slightly ahead of the other. (Ex. A, Fink Depo. at 67.)

When the crew got back to the engine's cab, they told Fink that "the switch looked funny or looked weird or . . . something along those lines." (*Id*. at 68.) Fink asked them what they meant, and the conductors reported that "there were spaces on both sides so [the conductors] didn't know which way the switch was lined." (*Id*. at 68.)

Fink "asked [the conductors] if we damaged the switch." (Ex. A, Fink Depo. at 70.) They told him "we stopped short of the switch." (*Id*. at 70.) Indeed, they told Fink that multiple times. (*Id*. at 72.) Both Carrol and Christianson testified that they told Fink they did not think they had damaged the switch.  (Ex. E, Fink Invest. Tr. at 57-58, 64 (Carroll) 66, 68-69 (Christianson.) Neither of them spoke to Fink until after they had directed him to pull ahead.  (*Id*. at 70.)  What they told Fink is the same thing they reported to Trainmaster Schneider.  (*Id*.)

During his conversation with the conductors, it became clear to Fink that they did not "know even if the switch was damaged." (Ex. A, Fink Depo. at 70.) Since the crew was unable to explain the switch's condition, Fink allowed them to warm up in the cab and the three of them went back to "look at the switch . . . and see if it was in fact damaged and gapped and all those things." (Ex. A, Fink Depo. at 71.) When Fink inspected the switch, it was gapped and he made a report to the dispatcher. (*Id*. at 72.)

## IV.    Fink properly reports the damaged switch

Fink did not try to hide the issue. Instead, he immediately reported it to BNSF.

What Fink reported to the dispatcher was automatically recorded by BNSF's radio system. (Ex. E, Fink. Invest. Tr. at p. 31-33.) Fink's report was that "there's a big gap on the side that should be flush. It looks like [the] bar is bent in on it too." (*Id*. at 32.) Fink told the dispatcher that

the crew was "gonna tag the switch out of service" and asked the dispatcher to "let somebody in mechanical know." (*Id.*)

When the crew arrived at the Dilworth yard, they reported what happened to Schneider. The conductors told Schneider what they told Fink, that they had gotten close to the switch (and may have) but did not think they had been the ones who had damaged the switch. (Ex. E, Invest. Trans at 38.) Like Fink, Schneider took the conductors at their word. Schneider also told the crew that a different group of employees "had damaged it earlier". (Ex. A, Fink Depo. at 75; Fink Invest. Tr. at 37-38.) Schneider testified that a regulator plow was in the area and could have caused the gapped switch. (Ex. O, Schneider Depo. at 25; Ex. E, Fink Invest. Tr. at 37-38.) After the conductors reported to Schneider that they believed that they had gotten close to the switch but had stopped short and Schneider told them not to worry about the situation, he directed the crew to provide this account in written statements. (Ex. O, Schneider Depo. at 23-25.; Ex. E, Fink Invest. Tr. at 12-13.)

Schneider testified that Fink did the right thing by reporting the switch, taking it out of service, and that the work he did securing the train that night was "exemplary." (Ex. E, Fink Invest. Tr. at 43-46)

## V.   Schneider's tune changed after Fink reported a safety concern

Immediately after Fink gave Schneider the written report, he raised a safety concern with Schneider regarding the outbound inspection rule. Specifically, Fink "asked for clarification about the inbound inspection rule." (*Id.* at 81.)  As noted above, this system was not safe because it does not demonstrate to a crew that the train will enter the emergency braking application should there be a sudden need to stop the train.

12

When Schneider tried to deflect and refer Fink to Selzer, Fink insisted on calling Selzer right then and there. (*Id*. at 81-82.) During that call, Fink raised "the improper utilization of the inbound inspection rule that is intended to further mask the safety issue." (*Id*. at 86-87.) The call was tense.

After the call, Schneider did an about face, charging the crew with dishonesty. Schneider claims that his decision to charge the crew with dishonesty was motivated by a Roadmaster, Dustin Marquez, who notified him that there was an automated report of a track problem from the switch in his inbox. (Ex. O, Schneider Depo. at 16.) After taking the crew's statements, Schneider testified he called the Roadmaster who told him the switch rod was bent. (*Id*. at 17.) The automatic notification—which has never been produced during discovery – came after the crew reported the defect to the dispatcher and while the crew was returning to Dilworth. In this respect, the crew's report to dispatch was equally likely to have generated the automated notification.

## VI.   Schneider accuses Fink of dishonesty instead of failure to report

Shortly after Fink made safety complaints about the outbound inspection procedure, Schneider changed his mind as to how the switch was damaged. Rather than being damaged by the regulator plow that was in the area, Schneider now believed that the crew must have damaged the switch and lied about it. (*Id*. at 19-20.)

Fink had no reason to lie. Even assuming the crew damaged the switch, the conductors and not Fink would have been culpable. Terminal Manager Demarais explained it succinctly:

Q:  If a crew -- if two conductors don't line a switch and they tell the engineer to shove over it, not knowing it, the engineer is not going to get disciplined in that case?

A. Correct.
Q. Because he didn't have any responsibility for -- he's just following the conductor's orders, right?

A. Correct.

13

Q. And -- so putting the reporting aside, this isn't an incident that Mr. Fink would have gotten discipline for, for going through the switch?

A. Well, he -- if he was instructed to shove over the switch and he was following his rules of stopping half the range and -- and all of the rules in place, no, he wouldn't have gotten in trouble.

(Ex. X, Demarais Dep. at 52-53.)  Simply, there was no motivation or reason for Fink to lie because this is not an event he could have gotten disciplined for because under BNSF rules and federal law (49 C.F.R. 218.99(b)) he was not the responsible employee.

It is also worth noting that Schneider had discretion regarding whether to charge Fink with a rule violation and if he charged him, with what rules to charge him.  (Ex. C, Detlefsen Depo. at 50.) Schneider exercised that discretion by charging Fink with four different rules, GCOR Rules 6.5, 8.12, 8.2 and 1.6. (Ex. O, Schneider Depo. at 51-58.) Of those rules, only GCOR 1.6 implicates honesty or morality and only GCOR 1.6 is a standalone dismissible violation. (Ex. M, PEPA Policy.) The others relate to shoving movements (causing a train to go backwards on track) and the switching operations, which are solely the responsibility of conductors during shoving movements.

Importantly, there is another rule that applies with equal force to this situation that is not a dismissible offense. Specifically, employees can be disciplined for failing to accurately report an issue. The difference between failing to accurately report an issue and lying about the issue is subjective. The severity of discipline that can be imposed for them is not. One can be used to terminate an employee, and the other cannot.

## VII.   BNSF deviates from company policy in disciplining Fink

### A.  The hearing process is a sham.

Pursuant to his union's collective bargaining agreement with BNSF, Fink was entitled to an internal hearing before he could be disciplined. The hearings, however, are more of a procedural

than a substantive hurdle to imposing discipline because the process favors BNSF at every turn.

For example:

- The conducting officer is a BNSF manager serving as both prosecutor and judge. They "must prove the charge" but are also tasked to be "impartial." (Ex. T, Conducting Officer Training Material at 6-7.) BNSF encourages the conducting officer to work with witnesses when drafting the investigation charge. (*Id.* at 3.)

- Employees are represented by fellow union members and cannot be represented by attorneys. (Ex. Q, Detlefsen 30(b)(6) Depo. at 42-43.)

- Employees cannot require the railroad to bring evidence or compel witnesses to attend the hearing and the railroad decides who can testify, about what, and what evidence can be presented. (Ex. Q, Detlefsen 30(b)(6) Depo. at 57-58; Ex. D, Booke Depo. at 91-92.)

- The investigation uses a "substantial evidence" standard of proof that is below 50% probability. (Ex. Q, Detlefsen Depo. at 58-59; Ex. T, Conducting Officer Training Material at 2.)

Indeed, it is undisputed that the hearings rarely if ever result in a charged employee being exonerated.

An important component of the discipline process is that the decision to discipline or not discipline (or what discipline to impose) is based on the record created at the investigation hearing. In other words, the record is restricted to the evidence and testimony presented at the hearing, like an appellate court reviewing a trial court decision.

What evidence is presented at the investigation is important because an accused employee and their representatives do not have an opportunity to challenge things not presented at the investigation. (Keel Depo. at 101-102.) BNSF's 30(b)(6) deponent admitted that assessing discipline based on factors outside the record developed at an employee hearing is a deviation from its standard policy. (Detlefsen Depo. at 49.) That is because only information contained in the investigative transcript and exhibits are supposed to be considered by upper management as part of BNSF's review process. (Detlefsen Depo. at 48.) The decision whether to provide an employee

with leniency, like the trainee received, is provided by local management is not subject to review by PEPA or upper management. (Detlefsen Depo. at 79.)

In fairness to BNSF, someone from its labor relations department reviews the transcripts from the hearing after the fact. (Detlefsen 30(b)(6) Depo. at 45-46.) But they review it to ensure only that the collective bargaining agreement was followed. (*Id.*) Indeed, BNSF cannot identify anyone who has ever been exonerated because of labor relation's review. (Detlefsen Individual Depo. at 93-97.)

### B. Fink's hearing is no exception

Fink's investigation was held on March 21, 2019. During his investigation, Fink maintained that the crew told him they got close to the switch but did not enter it. (Fink Invest. Tr. at 38.) Over Fink's objection, BNSF also did not call Dustin Marquez, the Roadmaster, or introduce evidence of the automated defect notice at the company hearing. (Fink Invest. Tr. at 34.) If BNSF really wanted to get to the truth of the matter, the Roadmaster was a necessary witness to testify. Only he knew "exactly how the switch was damaged and if the engine actually went all the way through it or not." (Booke Depo. at 92.) Despite Schneider's testimony that the Roadmaster convinced him the crew damaged the switch, BNSF refused to allow him to be called and "claimed that he had no part in the actual incident." (*Id.*; Fink Invest. Tr. at 34.)

Fink summarized the event and his culpability at the hearing as follows:

I was an engineer [who] shoved my train backwards with proper protection . . . with not one but two employees protecting the movement. I was not in a position to see what was happening on the rear of the train. I performed my duties and followed the rules correctly based on my . . . training from BNSF. . .

When we contacted the Dispatcher to report the damaged switch, I put [my] phone on speaker mode so everyone had an opportunity to speak up. I relayed the information that was provided to me.

If I had ever been told that our movement resulted in damage to the switch, I would have relayed that information to the Dispatcher and Trainmaster.

(Fink Invest. Tr. at 86.)

Fink also questioned Schneider and management's motivation for holding the investigation:

> [W]hy was I even included in this investigation? . . . I provided a sworn deposition regarding the safety concerns that were completely ignored and later resulted in an employee injury and the . . . pending Cary Jergens (sic) versus BNSF lawsuit. I filed reports with the Federal Rail Administration regarding multiple trains that the distributed power would not properly go into emergency brake application, which is another safety issue that's not been given proper attention over the last three years, and reported to the FRA a conversation that I had with Road Foreman of Engine Selzer about the issue and the improper utilization of the inbound inspection rule that is intended to further mask the safety issue.
>
> In fact, this conversation happened on Trainmaster Schneider's phone in Trainmaster Schneider's office in the presence of Trainmaster Schneider on the day in question.
>
> Could this investigation simply be an attempt to discredit me or retaliation of reporting these safety concerns that pose a risk to the workforce and general public?

(Fink Invest. Tr. at 87.)

### C. BNSF's discipline is overly harsh and based on Schneider's charging decision and Demarais's leniency decision

In this case, BNSF made its termination decision based on the word of Jacob Demarais. On April 3, 2019, Demarais made a recommendation to "grant leniency to the student conductor because his personal conversations with the employee "did not match the transcript . . ." (Ex., FINK_BNSF_000849 Email Chain.) Demarais testified that this conversation occurred before the investigation hearing, so BNSF could have presented that testimony at the investigation. (Demarais Depo. at 111.) Since the conversation happened outside of the hearing process and Demarais did not testify, there was no record of it at the investigation. This, despite Carroll being the conductor who was charged with protecting the point and being Fink's eyes and ears. Demarais did say, however, that the company does not take employees charged with dishonesty at their word. (Demarais Depo. at 93-95.)

17

Demarais did not testify during the investigation, but each member of upper-management ultimately sustained his recommendation of dismissal for Fink and leniency for Carroll.

Demarais was aware of Fink's safety concerns at took issue with them. He also was not a particularly trustworthy manager. He is currently in prison for possessing child pornography. *U.S. v. Demarais*, 1:32-CR-00130-DMT (D. N.D. 2022.) He kept it on his work phone, and lied to BNSF at every turn when it questioned him about his phone.

## VIII.   BNSF fires Fink based on the word of Demarais and Schneider and relied upon evidence that was not presented at the hearing

Schneider's decision to charge Fink with a GCOR 1.6 violation and Demarais's decision not to extend leniency to him permeated the decision-making process. Upon review of the termination decision, BNSF management conceded that it could be considered "too harsh." (Ex. M, PEPA Review Summary at 2.). Yet, because the initial charge was dishonesty and not a failure to report a track defect, the GCOR 1.6 the PEPA made the conduct a stand-alone dismissal.

Detlefsen testified that leniency is not available in cases involving a standalone dismissal. (Ex. Q, Detlefsen 30(b)(6) Depo. at 100-101.) Specifically, Detlefsen testified that company "practice" is for employees who commit stand-alone dismissible offenses to stand for investigation and go through PEPA. (*Id.*) Detlefsen is wrong on that point—BNSF produced at least two other employees explicitly accused of dishonesty who had their investigations cancelled. (Ex. W, Dishonesty Cancellations.) Demarais contradicted her too noting that he could have extended leniency to Fink avoiding the need for an investigation. (Ex. X, Demarais Depo. at 71.) It is also contradicted by the fact that Carroll, who lied—according Demarais—both before and during the hearing, was not terminated.  In policy and practice, local management decides the seriousness of the charge and whether to offer an employee leniency.

Detlefsen and upper management neither reviewed the refusal to provide leniency nor Schneider's charging determination. BNSF terminated Fink on April 5, 2019.

Moreover, it is clear that the recommendation to fire Fink and not fire Carroll was based primarily on evidence not presented or discussed at the hearing.  As noted above, like a court appeal, the record for disciplining an employee is contained to the hearing record.  But the terminal manager who recommended firing Fink and not firing Carroll admits they did not follow this protocol.  In fact, Demarais confirms that that the record should be contained to the investigation transcript and should not include any off-the-record conversations.  Demarais then admitted that is exactly what occurred and exactly what his recommendations were based upon.  (Ex. Demarais Dep. at 66-67, 106-107)

## IX.    BNSF attempts to impeach Fink's credibility in *Jurgens* with his termination

In pretrial filings, Fink moved to exclude evidence of the reason of his termination. (Ex. J, Plaintiff Motion in Lime - *Jurgens*.) In its responsive brief filed on June 10, 2019, BNSF argued that Fink's circumstances of termination – i.e., a charge of dishonesty—should be considered by the jury as evidence of his credibility. (Ex. K, BNSF Motion in Limine – *Jurgens*.)

## X.    BNSF terminating Fink for failure to report is an anomaly

BNSF's decision to dismiss Fink is highly unusual. Pursuant to the Railway Labor Act, Fink's union could (and did) appeal his termination to an arbitration panel. That panel found that the punishment imposed was too harsh to the point it violated the collective bargaining agreement and ordered BNSF to reinstate Fink. (Ex. S, PLB Decision.)

Even setting aside the arbitration panel's observation, BNSF's own records cast doubt on its claim that it consistently enforces its policy on dishonesty. According to the Conducting Officer Training Slides, 75% of all rule violations result in some form of leniency. (Ex. T, Conducting Officer Training Material.)

In this litigation, BNSF disclosed 141 employees on the Twin Cities Division, which includes Minnesota and North Dakota who were charged with violating GCOR Rule 1.6. (Ex. U, BNSF Answer to Request for Admission No. 10.) The results of GCOR 1.6 charges on the Twin Cities Division show how disproportionate Fink's punishment was:

- 10%—14/141—were dismissed from service, like Fink (Ex. U, BNSF Requests for Admission.)
- 27%—39/141—were cancelled before the investigation began. (*Id*. at Request 12)
- 31%—44/141—received a record suspension where the employee does not actually serve a suspension, like trainee Carroll received. (*Id*. at Request 17)

In other words, it is over *five times* more likely that an employee on the Twin Cities Division charged with a GCOR 1.6 violation – like dishonesty, immorality, or insubordination—will keep their jobs without serving any suspension than be fired. (*Id*.)  This is true of both engineers and conductors. (*Id*.) As noted above, several witnesses who regularly interact with BNSF's discipline system have *never* seen an engineer fired for Fink's conduct and BNSF has failed to produce such a comparator in this case. (Ex. DD, Keel Depo. at 70-71; Ex. X, Demarais Depo. at 74-75; Ex. D, Booke Depo. at 105-106; Ex. V, Shove and Failure to Report Comparators.)

Seventeen employees[3] disclosed who were charged with GCOR 1.6 violations were also charged with failure to report a rule violation or violation of a shoving rule. (Ex. V, Shove and Failure to Report Comparators.) No other engineer was terminated for the same conduct. (*Id*.)

## LEGAL STANDARD

### I.    The Federal Rail Safety Act was enacted to address workplace retaliation in the rail industry

Congress has long recognized that railroads put productivity ahead of safety, including by retaliating against employees who report safety concerns, and that such conduct endangers not

---

[3] This excludes Fink and his crew.

only the railroads' employees but also the public. *See, e.g., Hearings*. Over the years, Congress has tried numerous regulatory fixes, each of which has failed to deter railroads from harassing, intimidating, and retaliating against employees who report safety concerns. *Id*. After years of deliberation, hearings, and debate, Congress therefore amended the Federal Rail Safety Act of 2007 by *The Implementing Recommendations of the 9/11 Commission Act of 2007*, Pub. L. 110-53, 121 Stat. 444, and the *Rail Safety Improvement Act of 2008*, Pub. L. 110-432, 122 Stat. 4848.

The amendments embody not only Congress's decision to end its reliance on rail industry self-policing and the FRA's lax enforcement of anti-retaliation regulations, as demonstrated by the amendments empowering juries to protect railroad employees and their communities, but also Congress's recognition of the railroad industry's retaliatory culture, as demonstrated by the amendment heavily tilting the scales of justice in favor of employees. *See* 49 U.S.C. § 20109(a)(1)-(2), (d)(2)(A)(i) (incorporating 49 U.S.C. 42121(b)). Specifically, Congress relaxed the standards of proof and causation to make retaliation claims easier to prove in two ways: (1) The FRSA, as amended, prohibits railroads from "discharge[ing], demot[ing], suspend[ing], reprimand[ing], or **in any other way discriminat[ing]** against an employee if such discrimination is due, in whole or in part" to the employee's protected activity, which includes expansive language that is not found in Title VII or any of the other "traditional" employment discrimination statutes to which BNSF attempts to liken the FRSA; and (2) The FRSA, as amended, incorporates the burden-shifting framework governing the employee protection provision of the Wendell H. Ford Investment and Reform Act for the 21st Century ("AIR-21"), which is a burden-shifting framework that is much more friendly to plaintiff-employees than is the *McDonnell Douglas* burden-shifting framework that is employed by Title VII and the other "traditional" employment-discrimination statutes to which BNSF attempts to liken the FRSA. *Id*. (emphasis added.)

Under the AIR-21 burden-shifting framework, an employee establishes his or her case by demonstrating that his or her safety report "was a contributing factor in the unfavorable personnel action." 49 U.S.C. § 42121(b)(2)(B)(iii). The Eighth Circuit has interpreted "contributing factor" to mean "any factor which, alone or in connection with other factors, tends to affect **in any way** the outcome of the decision." *Hess v. Union Pac. R.R. Co.,* 898 F.3d 852, 857–58 (8th Cir. 2018) (citing *Kuduk v. BNSF Ry. Co.,* 768 F.3d 786, 791 (8th Cir. 2014). Since the FRSA incorporates the AIR-21 standards, the "burden shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard" that controls most federal retaliation and employment discrimination claims. *Smith-Bunge v. Wisc. Central, Ltd.*, 60 F.Supp. 3d 1034, 1040 (D. Minn. 2014) (citing *Araujo v. New Jersey Transit Rail Operations, Inc.*, 708 F.3d 152, 156 (3d Cir. 2013)).

Once plaintiffs demonstrate that their protected activity contributed in some way to the adverse actions taken against them, the burden of proof then shifts to their railroad-employers to prove "by clear and convincing evidence that the employer would have taken the same unfavorable personnel action in the absence of [the protected activity]." 49 U.S.C. § 42121(b)(2)(B)(iv). "[F]or employers, this is a tough standard, and not by accident." *Araujo*, 708 F.3d at 152. "The standard is 'tough' because Congress intended for companies . . . to face a difficult time defending themselves, due to a history of whistleblower harassment and retaliation in the industry." *Id*. at 152.

In short, Congress amended the FRSA so that ordinary citizens with common sense and experience will decide whether railroad managers have carried their burden, which is heavy, to show they are honest when they explain why adverse employment actions were not motivated by retaliatory intent or that they would have taken the same steps even if they were motivated by

retaliatory intent. *See Hearings*. Because of a corporate culture that has been operating to suppress

the law, Congress has put the burden on defendant-railroads to prove the absence of retaliation

(and not on plaintiff-employees to prove retaliation). *Id*. Plaintiff-employees must therefore only

(1) establish that their protected conduct was a "contributing factor" in the adverse action that

followed, and (2) convince the fact-finder that their employers failed to carry their burdens to prove

by clear and convincing evidence that they would have taken the same unfavorable personnel

action in the absence of the protected activity. *Id*.

## II.      Summary judgment is not appropriate because there is more than one reasonable interpretation of the record

Summary judgment is appropriate only when there are no genuine issues of material fact

and the moving party can demonstrate it is entitled to judgment as a matter of law. Fed. R. Civ. P.

56(a). A fact is material if it might affect the outcome of the case, and a dispute is genuine if the

evidence could lead a reasonable jury to return a verdict for either party. *Anderson v. Liberty

Lobby, Inc.*, 477 U.S. 242, 248 (1986). At all times, evidence offered by the non-moving party is

to be believed and all justifiable inferences therefrom are to be drawn in a light most favorable to

that party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). "If

reasonable minds could differ as to the import of the evidence, summary judgment is

inappropriate." *Quick v. Donaldson Co., Inc.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996) (quoting

*Anderson*, 477 U.S. at 250).

## ARGUMENT

## I.      Fink has satisfied the contributing factor element through circumstantial evidence.

Fink can establish "that his [protected activity] was a contributing factor in his

discharge by direct or circumstantial evidence." *Ray v. Union Pac. R. R. Co.*, 971 F. Supp. 2d 869,

884 (S.D. Iowa 2013) (citing *Araujo*, 708 F.3d at 160) (holding that neither direct evidence nor

evidence of motive is required to prove the contributing factor element) (citing, *inter alia*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003); *DeFrancesco v. Union R.R. Co.*, No. 10-114, 2012 DOL Ad. Rev. Bd. LEXIS 23 (ARB Feb. 29, 2012) ("The contributing factor element of a complaint may be established by direct evidence or indirectly by circumstantial evidence.")).

### a.   Fink has abundant circumstantial evidence that he was retaliated against

As articulated by the U.S. Supreme Court, "Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence." *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) (citing *Rogers v. Missouri Pac. R. Co.*, 352 U.S. 500, 508 n. 17 (1957)). In FRSA retaliation actions, the Court can consider temporal proximity, deviations in company policy, shifting explanations, comparator evidence, hostility toward protected activities, and pressure that management was under in assessing whether Fink has satisfied the contributing factor element. *Ray*, 971 F. Supp. 2d at 884-85.

#### i.   *Temporal Proximity*

##### 1.   Emergency Braking

The temporal proximity for Fink's complaints regarding the emergency braking issues is sufficient to infer retaliation. BNSF admits that the complaint was made approximately two months before the adverse employment action. Courts have found that such temporal proximity can support a finding of retaliation. *See BNSF Ry. Co. v. U.S. Dept. of Labor*, 816 F.3d 628, 633-34 (105 days between protected activity and termination temporally related).

BNSF, apparently, argues that a mere six-day gap would be sufficient to preclude liability under the FRSA relying on *Smith-Bunge v. Wis. Central Ltd.*, 946 F.3d 420, 424 (8th Cir. 2019). But the six days referred to in *Smith-Bunge* was not the length of time between the protected activity and the adverse action—it was the length of time between the district court ruling on a summary judgment motion in a related case and the company investigating misconduct in the

subsequent case. *Id*. at 424 ("six days after he won summary judgment, Wisconsin Central hired Rogers to investigate. . .") The Court should not adopt BNSF's "six day" limitation based upon its misreading of *Smith-Bunge*.

What is more, Fink made complaints regarding the distributed power failures and trains not entering emergency braking on three separate occasions: February 5, 2019; February 10, 2019; and February 16, 2019.

Fink testified—both at his deposition and during the company disciplinary hearing—that he and Schneider called Road Foreman of Engines Selzer and discussed the outward train protocols. (Exs. A and E., Fink Invest Tr. at 81-87; Fink Depo. at 111-112.) Crediting Fink's testimony – as is required under the summary judgment standard – a reasonable jury could find temporal proximity of mere hours between Fink's complaint to Schneider and his decision to charge Fink deciding Fink violated rules regarding dishonesty.

During his deposition, Fink testified that he personally experienced the front part of his train not enter emergency braking resulting in his train breaking in two. (Ex. A, Fink Depo. at 135-136.) This is memorialized in a memorandum from a third party. (Ex. P, SMART-TD Memos). He reported the issue to the dispatcher, Road Foreman Selzer, and to the FRA on February 10, 2019. (*Id.*) This was only four days before his investigation was noticed. This too would be sufficient, even under BNSF's misreading of Eighth Circuit precedent.

Finally, Fink's report to the FRA on February 16, 2019, too is protected under the FRSA. This is before the investigation hearing was held and before BNSF notified Fink of his termination. This is particularly true since BNSF alleges there is "independent significance of non-protected activity" intervening between Fink's protected activity and the adverse action. Although the

railroad cites no authority for its novel "independent significance" theory, subsequent protected activity would logically undermine any alleged break in the contributing factor analysis.

This final complaint is also significant in the context of Demarais's decision to conduct an independent investigation in his office with Carroll. Demarais was upset that crews went to the FRA instead of to him with complaints about the emergency braking issue. (Ex. D, Booke Depo. at 95; Ex. X, Demarais Depo. at 34-36.) After conducting his own investigation of the facts, Demarais recommended leniency to an employee who did not "go over his head" in reporting safety complaints to the FRA and firing the one that did.

### 2.  Walkway Complaints

Temporal proximity cuts in Fink's favor when assessing his termination from the perspective of the *Jurgens* FELA case. BNSF deposed Fink on October 9, 2018. (Ex. G, Fink *Jurgens* Deposition.) The railroad sent Fink a letter on February 14, 2019, setting his company disciplinary hearing. According to Schneider, the decision to charge him with dishonesty and not provide leniency was made shortly after reviewing the video on February 6, 2019. Far from being a three-year gap, the time between Fink's testimony in *Jurgens* and his investigation being noticed was a mere four months. But importantly, BNSF argued after Fink's termination that the circumstances surrounding Fink's termination were relevant to his "credibility" in the then-upcoming *Jurgens* trial as late as June 10, 2019. (Ex. K, BNSF Motion in Limine – *Jurgens*.) In other words, the railroad continued its attempt to use Fink's termination to its advantage up until two months after it fired him.

### ii.  *Deviations from Policy and Inconsistent Application of Policies*

### 1.  Deviations from Policy

BNSF inconsistently applies GCOR 1.6, which is not surprising given the sheer breadth of the rule and local management's discretion in charging and prosecuting rule violations. For

example, BNSF policy makes no effort to distinguish between degrees of lies or so-called "white lies." (Ex. C, Detlefsen Depo. at 50-51.) Instead, it relies upon local management to determine when an employee violates its "conduct" rule prohibiting dishonesty, immorality, discourteousness, and insubordination. (*Id*. at 50.)

Demarais—and others—confirm that any discipline decision is supposed to be based upon the factual record contained in the investigation hearing transcript. Demarais openly admits that his recommendations were based on ex-parte communications with witnesses and that there is no record of these interviews, which is a violation of BNSF's discipline protocol.

In this case, BNSF deviated from policy by considering factors outside the investigation transcript and exhibits in extending leniency. Demarais's "off the record" conversation with Carroll—which occurred before the investigation and could have been introduced—was a violation of BNSF policy. What is more, upper management then relied upon that conversation in extending leniency to Carroll at the exclusion of Fink. In short, the recommendation to fire one employee who engaged in protected activity (who also could not be culpable for damaging a switch) and not fire another (who was culpable) based upon an ex-parte and unrecorded interrogation was out of the ordinary for BNSF.

## 2. Comparator Evidence

As noted above, GCOR 1.6 charges vary wildly both in the conduct described and the result of the investigation. In ninety percent of cases, however, the employee is not terminated. (Ex. U, BNSF Answers to Second Set of Requests for Admissions at 11.)

BNSF will contend that the Court should only consider charges of GCOR 1.6 dishonesty. But the railroad's own 30(b)(6) deponent, Stephanie Detlefsen, foreclosed that argument when she testified the rules violated are not always properly identified in charging or dismissal letters. (Ex.

Q, Detlefsen 30(b)(6) Depo. at 102-104.) Ultimately, it should be for a jury to decide whether the 1.6 comparators were dishonest or are similarly situated.

The evidence that BNSF was compelled to disclose Illustrates why. Apart from Fink's crew, eight employees produced failed to report information in connection with their rule violation. (Ex. V, Failure to Report Comparators Schumacher, Wells, Anderson, Sanchez, Olson, Holman, Senger, Colucci.) Of those eight, only one conductor was dismissed. (*Id.*) Both engineers accused of failing to report – Senger and Holman – were extended leniency and kept their jobs. (*Id.*, Senger and Holman.) To the extent that omission of information constitutes a dismissible offense, one would expect all these employees to be fired. But the reality is, local management extended leniency in the absence of protected activity except to the must culpable employees.

Failure to protect the shove movement too is not dismissible conduct, as BNSF has granted entire three-person crews in North Dakota leniency in connection with incidents where the crew fails to protect the shove. (Ex. Y,  Failure to Protect Comparators–- Graves, Thompson, Robertson.) Although details are limited because there is no investigation transcript, Thompson was an engineer along with Graves, a conductor, and Robertson, a switchman. (*Id.*)  The entire crew was charged with failure to protect the shove, including a GCOR 1.6 violation. (*Id.*)  The engineer – who was moving the train backward for the shove and not protecting the point – had his investigation cancelled entirely. (Ex. Y, Thompson Cancellation.) The conductor – who is the engineer's eyes and ears and was protecting the shove – received a standard formal reprimand. (*Id.* Graves Reprimand.) Unlike Fink, however, both had lengthy disciplinary records. (Ex AA., Graves and Thompson Discipline Transcripts.)

BNSF contends that the student conductor, Carroll, is not a proper comparator. In the sense that BNSF alleges Carroll was dishonest three times – once orally to Schneider, twice in his written

28

statement, and thrice at the company disciplinary hearing—Fink disagrees. If dishonesty is dishonesty, management's decision to give the employee without a history of safety complaints, Carroll, leniency and fire a known safety advocate, Fink, is legally significant.

Fink agrees with BNSF that Carroll and Christianson are not "similarly situated in all relevant respects" to the extent that a conductor and engineer have fundamentally different roles in shove movement, both under BNSF rules and federal law. In a shove movement, the conductor is the engineer's eyes and ears. (Ex. E, Fink Invest. Tr. at 49; Ex. DD, Keel Depo. at 62-63; Ex. O, Schneider Depo. at 28; Ex. D, Booke Depo. at 104; Ex. X, Demarais Depo. at 44.) Under federal law, namely 49 C.F.R. § 218.99, the conductors are responsible for initiating, directing, and controlling a shove movement. Nobody disputes that the conductor guides the engineer and tells him how many cars back he should reverse the train. Thus, they are not comparable employees. BNSF managers, in fact, admit that Fink was not responsible for the shove movement or lining the switch and an engineer cannot be disciplined for damaging a switch under the facts of this case. In sum, unlike the conductors, Fink did not—and could not under BNSF rules and federal law— face any potential discipline for damaging the switch.

The significance of this fundamental piece of train operations explains why—apart from Fink—BNSF has been unable to produce a single other engineer in the country that it has terminated for similar conduct based on dishonesty. (Ex. DD, Keel Depo. at 70-71; Ex. X, Demarais Depo. at 74-75; Ex. D, Booke Depo. at 105-106; Ex. V, Shove and Failure to Report Comparators.)

### iii.   Shifting Explanations

Schneider proffered shifting explanations for disciplining the crew. First, he told Fink's crew that another crew damaged the switch, not to worry about it, and to provide written statements. (Ex. O, Schneider Depo. at 25; Ex. E, Fink Invest. Tr. at 37-38.) Then, once Fink

engaged in protected activity by complaining about BNSF's emergency braking solution to Schneider and Road Foreman of Engines Selzer, Schneider changes his tune and accuses the crew of dishonesty. Construing the evidence and all inferences in Fink's favor, a reasonable jury could consider this shifting explanation within hours of Fink's protected activity evidence of retaliation.

Fink also testified that after the company hearing was concluded, the investigating officer Anthony Keel:

> talked to everyone that was involved in the investigation from a principal standpoint . . . And at that time he indicated that these charges were . . . exaggerated I believe is the word that he used. And that . . . his recommendation for coming out of the investigation was going to be a written warning to Mr. Christianson and Mr. Carroll, and that his recommendation was going to be that I was completely exonerated . . .

(Ex. A, Fink Depo. at 195-196.) Booke recalled that conversation as well. (Ex. D, Booke Depo. at 45.) He testified that Keel "*was pretty sure there was no type of dishonesty*" and that "***Mr. Fink reported what he thought happened based on the information given by the conductor and conductor trainee***." (*Id*.) Keel, apparently, never made his recommendation.

### iv.   Hostility Toward Protected Activities

Cordell Booke, who was Fink's representative at the company discipline hearing, testified that management was "usually pretty hostile" to Fink's complaints regarding emergency braking procedures. (Ex. D, Booke Depo. at 95.) Booke also testified that Schneider had "some animosity there over safety issues" that were mostly "the walking conditions at Jamestown since at the time Mr. Schneider was the trainmaster on the territory. . ." (*Id*.) The conducting officer at the company disciplinary hearing noted that there was a "history" between Schneider and Fink. (Ex. E, Fink Invest. Tr. at 87.)

Fink also had a meeting with BNSF claims and an attorney before his deposition in *Jurgens*. (Ex. A, Fink Depo. at 94.) During that meeting, it appeared to Fink as though the attorney

was trying to obtain improper testimony at his deposition the next day. (Ex. A, Fink Depo. at 94-95.) Put another way, an attorney and claims employee "hinted darkly of unfavorable consequences" if Fink testified. This is precisely the conduct the Eighth Circuit has warned "is almost certain to satisfy the contributing factor element of an employee's prima facie case because harassment of railroad employees who report injuries was a major concern of Congress in enacting the whistleblower protection amendment." *Dakota, Minnesota & E. R.R. Corp. v. U.S. Dep't of Labor Admin. Review Bd.*, 948 F.3d 940, 947 (8th Cir. 2020).

### v. Pressure from Upper Management

Both Schneider and Demarais were under pressure from upper management that would have provided a motive for them to retaliate against Fink for his safety complaints.

#### 1. Walking Conditions – Schneider

BNSF produced the mid-year and end-year reviews for Schneider in 2018. At that time, Schneider was boasting about leading safety initiatives on the "Slip, Trip, Fall team." (Ex. F, Schneider Midyear 2018 PMP.) Schneider also noted his work with "BNSF claims and BNSF legal team in connection with . . . employee injuries." (*Id.* at 6.) By year end, however, Schneider's internal rankings with management had slipped and he was placed on a performance improvement plan for leadership failures. (*Id.*) Construing all inferences in his favor, Fink assisting his co-worker by reporting safety complaints about walking conditions provides Schneider with a motive for over charging him.

#### 2. Emergency Braking Failures – Demarais

BNSF also produced the mid-year and end-year reviews for Jacob Demarais. In both his mid-2018 and end of year review for 2018, Demarais mentions "the coal straggler process" and reducing dwell time for coal trains. (Ex. CC, Demarais PMPs.) Demarais noted that his changes were "not taken well" by the crews and that they said it "couldn't be done." (*Id.* at 4.) Using the

new process described in his PMP, Demarais claims that he reduced dwell times by 15 to 20 days. (*Id*.)

During his deposition, Demarais explained that he met with a yardmaster and Road Foreman of Engines Selzer to identify the problem and develop a solution. (Ex. X, Demarais Depo. at 29-32.) That solution was to "draw the air down to zero in an inspection yard" to allow for a proper inspection. (*Id*. at 32-33.) Demarais admitted, however, that train crews still had concerns "about the trains not propagating emergency" and that he could not "know what would happen 50 miles down the road . . ." (*Id*. at 33.) When crews continued to complain to the FRA, Demarais expressed concerns to the crews about them going over his head. (*Id*. at 34-35.) Construing all inferences in Fink's favor, Demarais's PMP and Fink's complaints provide a separate basis for him to have refused to grant leniency to Fink.

## II.   BNSF's arguments rely on misstatements of the law, construe inferences in its favor, and omit material facts

BNSF tries to distance Schneider and Demarais from the decision to terminate Fink, arguing that Sundem made the termination decision which was upheld by Detlefsen and the PEPA team. (Def Br. 23, 29.) But Sundem and Detlefsen's knowledge of Fink's protected activity is irrelevant both because of the nature of the applicable burden-shifting framework and BNSF's kangaroo-court hearing process. And even were their knowledge somehow relevant, they were aware of Fink's protected activity.

### a.   Review by upper management does not immunize BNSF from anti-discrimination and/or retaliation statutes.

BNSF uses the insulation its discipline process creates between the plaintiff and the decision makers to argue that it is entitled to summary judgment, i.e., it argues it is entitled to summary judgment regardless of whether Fink's protected activity caused Schneider and Demarais to have it out for him because they had nothing to do with the termination decision. But the

question before the court is not whether Sundem and Detlefsen decided to terminate Fink because of his protected activity; rather, it is whether any reasonable person could find that Fink's protected activity contributed in any way to his termination. *See*, *e.g.*, *BNSF Ry. Co.*, 816 F.3d at 638-339.

Schneider and Demarais fit the bill. They were not "trivial participants" because Schneider made the charging determination and provided the only evidence against Fink at his discipline hearing while Demarais decided firing Fink was warranted based on evidence not even discussed or presented at the hearing. Although Detlefsen and Sundem reviewed the transcript, "there is no suggestion they did anything other than review what [lower management] had alleged against [Fink] and testified to at the investigation." *Johnston v. BNSF Ry. Co.*, 2017 WL 4685012 (citing *Ludlow v. BNSF Ry. Co.*, 788 F.3d 794, 802 (8th Cir. 2015)).

BNSF's argument to the contrary is one it has made before and that courts have rejected. In *Fresquez*, for example, the plaintiff alleged that BNSF had manufactured a reason to justify terminating him in retaliation for reporting safety concerns. BNSF made the exact same argument it makes here, that it was free to retaliate against Fresquez because the managers who knew about and disliked the him because of his safety concerns were not the decision makers. Like here, however, the manager  who knew about and disliked Fresquez because of his safety concerns were the managers who made the charging decision and testified against Fresquez in his internal hearing. The court therefore found that not only had Fresquez's protected activity contributed to his termination but also that BNSF could not prove its affirmative defense, discussed *infra* at 35, because Fresquez's managers had so greatly influenced the decision makers' decision:

> I also find that BNSF has failed to show by clear and convincing evidence that it would have terminated Plaintiff absent his protected activity. Again, it is impossible to know whether Paz would have reported Plaintiff to Carpenter for insubordination if Plaintiff had not refused to reclassify the defect in the first place. There is also evidence, based on Paz's statement that he wanted to find a reason to fire Plaintiff,

that Paz told Carpenter Plaintiff was insubordinate because of his refusal to reclassify defects.

The initial conversation between Paz and Carpenter led Carpenter to formally charge Plaintiff with insubordination, instead of a possibly lower charge like failure to follow instructions. Miller stated that he relied on the charge of insubordination in determining the appropriate level of discipline. And Detlefsen and Miller both relied on Paz's [testimony in the internal hearing] to conclude that Plaintiff was insubordinate. Although there is certainly evidence that Plaintiff was insubordinate, especially if you believe Paz's testimony, Plaintiff's and Paz's conflicting accounts of what happened on May 5 creates a genuine issue of material fact as to whether Plaintiff was insubordinate, failed to follow instructions, or was completely innocent. Due the centrality of Paz's involvement with Plaintiff's termination, and Plaintiff's allegations that Paz sought a reason to fire him, I cannot conclude there is clear and convincing evidence BNSF would have terminated Plaintiff in the absence of his protected activity.

Fresquez v. BNSF Ry. Co., No. 17-CV-00844-WYD-SKC, 2018 WL 6249686, at *7–8 (D. Colo. Oct. 2, 2018).

The *Fresquez* court's reasoning is sound and should be adopted here.

### b.  Upper management knew of Fink's allegation of retaliation by Schneider and did nothing about it.

It is also worth noting that the decision makers were not as ignorant as BNSF would have the Court believe. They knew of Fink's protected activities and his allegations of retaliation because he explained it during the company discipline hearing. (Ex. E, Fink Invest. Tr. at 81-82 (emergency braking failure) and 74-75 (depositions).) That investigation transcript was reviewed by Sundem and Detlefsen. What is more, both Detlefsen and Sundem participated in the conversation with Demarais where he made leniency recommendations. Far from being insulated from the decision-making process, the evidence shows that Schneider and Demarais's decisions effectively controlled the outcome of BNSF's internal hearings and decision making.

34

### III.    BNSF cannot show by clear and convincing evidence that it would have terminated Fink

Once Fink proves by a preponderance of the evidence that his FRSA-protected activity contributed to the adverse action taken against him, BNSF is liable unless it shows by clear and convincing evidence that it would have terminated Fink even in the absence of his protected activity. *See*, *e.g.*, *BNSF Ry. Co.*, 816 F.3d at 640. Importantly, "[i]t is not enough to confirm the rational basis of [BNSF's] employment policies and decisions." *Henderson v. Wheeling & Lake Erie Railway*, No. 11-013, 2012 DOL Ad. Rev. Bd. LEXIS 106, *34 (ARB Oct. 26, 2012). "Instead, [courts] must assess whether they are so powerful and clear that termination would have occurred apart from the protected activity." *Id.*

Regarding the way in which BNSF makes such showing, "it is not enough for [it] to show that [Fink] violated its safety rules, that it had a legitimate motive (i.e. [Fink] rule violations) for imposing the disciplinary action, or that it imposes 'appropriate discipline' against employees for safety violations and unsafe behavior regardless of whether they [engaged in protected activity]." *Defrancesco v. Union Railroad Co.*, No. 13-057, 2015 DOL Ad. Rev. Bd. LEXIS 51, *27 (ARB Sept. 30, 2015). "Instead, [BNSF is] required to demonstrate through factors extrinsic to [Fink's] protected activity that the discipline to which [Fink] was subjected was applied consistently, within clearly-established company policy, and in a non-disparate manner consistent with discipline taken against employees who committed the same or similar violations . . ." *Id.*

As noted by the court in *Sanders*, many of the factors in *DaFoe* overlap with the contributing factor analysis. *Sanders*, 2022 WL 17414504 *5 (Dec. 5, 2022). A more workable standard assesses whether BNSF has "proven the alleged [dishonesty] to be of such a nature that, combined with BNSF's regular business practices, it clearly and convincingly rose to a level requiring termination—totally apart from his protected activity." *Id*. In the *Sanders* case, the Court

determined that BNSF had treated similar employees less harshly and that Detlefsen and PEPA's review were "insufficiently independent" of the tainted decision maker's influence. *Id*. So too here where Detlefsen reviewed the charging decision of Schneider and did no review of Demarais's grant of leniency.

BNSF also failed to meet its burden because it cannot prove, much less by clear and convincing evidence, that every reasonable person would find that it has terminated every other engineer who followed his conductor's directions and reported a track defect based on that information. The evidence shows that GCOR 1.6 violations rarely result in termination and, even when dishonesty is charged or alleged, leniency is routinely provided. Even within Fink's crew, BNSF's rationale that it "always" dismisses dishonest employees crumbles because local management provided leniency to the trainee, Christianson.

### IV.    BNSF has failed to show that Fink is not entitled to punitive damages because its processes were not sufficiently independent

The railroad asks the Court to prevent Fink from asking the jury for punitive damages. Punitive damages are appropriate upon a showing of malice or reckless indifference to federally protected rights. *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 539 (1999). Although BNSF argues at length that its policies and procedures insulate it, courts have recognized that where "the entire charge and investigatory process was effectively guided and controlled by" the tainted decision-makers, punitive damages are appropriate. *Fresquez v. BNSF Ry. Co.*, 52 F.4th 1280, 1321 (10th Cir. 2022).

Construing the evidence in Fink's favor, Schneider and Demarais had the motive and opportunity to retaliate against Fink. Since Sundem and Detlefsen relied solely upon the investigation and transcript, their decision-making process was tainted. He was pressured to give false testimony by an attorney for BNSF and a representative of its claims department. When he

36

refused, local management accused him of being a liar and fired him. Under those circumstances, an award of punitive damages is necessary to punish BNSF's bad behavior and deter wrongful conduct in the future.

## CONCLUSION

Construing all evidence and drawing all inferences in Fink's favor, the Court should deny BNSF's motion in its entirety.

**BOLT LAW FIRM**

Dated: May 18, 2023                    By *s/ Joseph M. Sayler*
                                       Joseph M. Sayler
                                       David L. Tomenes
                                       2150 Third Avenue, Suite 350
                                       Anoka, MN 55303
                                       Telephone: (763) 406-7000
                                       joseph.sayler@bolthoffer.com
                                       david.tomenes@bolthoffer.com

                                       -and-

                                       Nicholas D. Thompson
                                       Casey Jones Law
                                       1330 Lagoon Avenue, 4th Floor
                                       Minneapolis, MN 55408
                                       Phone: (757) 477-0991
                                       Email: nthompson@caseyjones.law