# EXHIBIT A

```
 1                UNITED STATES DISTRICT COURT
 2              FOR THE DISTRICT OF NORTH DAKOTA
 3
 4     Michael Fink,                    )
                                        )
 5                        Plaintiff,    )  Court File No.
                                        )  1:20-CV-222
 6        vs.                           )
                                        )
 7     BNSF Railway Company, a          )
       corporation,                     )
 8                                      )
                           Defendant.   )
 9
10
11
12                     REMOTE DEPOSITION
13                            OF
14                      MICHAEL FINK
15
16
17
18
19
20
21
22
23     DATE:    Thursday, March 10, 2022
24     PLACE:   Veritext Virtual Zoom
25     BY:      Charla A. Pawlik, RPR
```

Page 22

1  example. Maybe this will help. So at Corporate
2  Technologies their main focus was cold calling. So
3  the job was to make as many cold calls as you could
4  every day and set as many appointments as you could,
5  and then you'd go out and meet with the business
6  owner and discuss IT services with them. But they
7  had specific matrix that you needed to hit in order
8  to be considered that you were doing your job, if you
9  will.
10          Same was true with Integra
11 Telecommunications. The same was true with
12 Pitney Bowes. With RDO Equipment there were -- it
13 was a -- it was more of a revenue based on the number
14 of sales that were coming in. I didn't -- it
15 wasn't -- I didn't go get my own business per se.
16 And prior to that, you know, when I -- when I oversaw
17 the accounts receivable team, that was all based on
18 those same kind of logical activity requirements, if
19 you will, as well.
20     Q.  Sure. So there were --
21     A.  I don't know if that answers your
22 question. Sorry.
23     Q.  Go ahead. No, that -- that -- that's
24 helpful. There were -- there were guidelines and
25 expectations as to your productivity --

Page 23

1     A.  Yes.
2     Q.  -- in those sales roles; is that what
3  you're saying?
4     A.  Absolutely.
5     Q.  Okay. Understood. All right. And
6  then you mentioned a couple times that National
7  Corporation -- National Capital Solutions Corporation
8  just kind of never took off; is that right?
9     A.  That's correct.
10    Q.  And -- and what year did that kind of
11 wrap up?
12    A.  Well, officially I was done with it
13 when I hired out on the railroad.
14    Q.  Got it.
15    A.  So my --
16    Q.  What's your date of service?
17    A.  August I think 19th of 2013.
18    Q.  Okay.
19    A.  August of 2013. I might be wrong on
20 the date.
21    Q.  No, that's fine. I -- I'm sure we have
22 that information somewhere and we can look that up.
23 But it's -- once you started at BNSF you were done
24 with your private company?
25    A.  Yes.

Page 24

1     Q.  Okay.
2     A.  At the -- well, at the same time I did
3  have a -- a real estate rental company as well, but I
4  sold out of those assets also around that same time
5  frame with the exception of renting out the house I
6  was living in in Fargo for a little while after my
7  family moved to Bismarck.
8     Q.  Okay. Got it. So on the side while
9  you had these other jobs going on, at some point you
10 owned some rental properties?
11    A.  Yes.
12    Q.  And then sold those and then had your
13 house in Fargo also before you moved to Bismarck?
14    A.  Right.
15    Q.  In any of those either in your private
16 life or in your business life or in your life as a --
17 a landlord, did you ever have any prior lawsuits?
18    A.  I did have to evict a tenant at one
19 point.
20    Q.  And that was just a fact of life when
21 you're a landlord; sometimes tenants don't pay rent?
22    A.  Yeah, they -- they didn't pay rent. I
23 tried to work with them. They still didn't make good
24 on rent and so an eviction was -- was issued.
25    Q.  Okay. Any -- any other lawsuits that

Page 25

1  you can recall?
2     A.  Oh, not that I remember.
3     Q.  And this is -- might sound like a
4  left-field question, but I tend to ask it in most of
5  our depositions. But have you ever been charged with
6  a felony or a crime involving dishonesty?
7     A.  No.
8     Q.  All right. So you mentioned that your
9  seniority date is August 2013 at BNSF. At the -- how
10 did you come to decide to apply for employment at
11 BNSF?
12    A.  Actually my -- my uncle, Mark Goodson,
13 was working as a dispatcher for BNSF. And called me
14 up one day and said that they were looking for people
15 in North Dakota, and he asked if I knew anybody that
16 would be interested. I don't think he had any
17 intention of me being interested when he called me.
18 And when I talked to him a little bit more about it,
19 at the time I was looking for something completely
20 different than what I was doing before and so I
21 thought I'd give it a try.
22    Q.  Why were you looking for something
23 completely different?
24    A.  Well, I was just looking for something
25 that was more stable than a commission-based job.

Page 58

1  A. It wasn't necessarily a requirement for
2  the job. Although there are times that a job like
3  this would have a brakeman so it's very possible that
4  you could have three crew members. Typically you
5  would have an engineer, a conductor and a brakeman or
6  just an engineer and a conductor. It is unusual that
7  you would have an engineer and two conductors.
8  However, my understanding was that since Carroll had
9  just passed his certification exam and he couldn't
10 hold a job based on his seniority that the railroad
11 didn't want to furlough everyone out of that class so
12 they were letting them work as conductors -- as an
13 additional conductor essentially.
14     Q. Okay. All right. All right. So you
15 guys go through your work, and at some point you
16 determine you need to go to Jamestown --
17     A. Yes.
18     Q. -- that work was to be done? What are
19 you going to do in Jamestown? Are you picking up an
20 engine, cars? What are you doing?
21     A. Picking up an engine, yes.
22     Q. All right. And can you kind of walk me
23 through your -- well, I guess any -- anything notable
24 about the trip from Mandan to the Jamestown yard?
25     A. No.

Page 59

1     Q. When you get to the yard limits, do you
2  stop and -- and check in with anybody or do you just
3  go about your tasks?
4     A. It's -- it's yard track, not yard
5  limits. Yard limits is a specific railroad term.
6  But so we stopped on -- it's Main 1 and Main 2 in
7  Jamestown. There are two main tracks there. I don't
8  remember which main track we were on. We would have
9  been on the one -- I believe we were on the one
10 further to the north, the north track.
11        The -- so we -- we stopped -- actually
12 there was -- before we left the yard office -- let me
13 back up. There was a new general order that we
14 discussed. A general order, a notice of some sort
15 that we discussed. When we were in the yard office I
16 brought it up to the yardmaster, Dee... I don't
17 remember her last name at the moment.
18        They had changed the rule to require
19 inbound train inspection. Any time you were...
20 Well, any time you were... The rule is called the
21 inbound train inspection rule. They were using it
22 for outbound trains. I told her that -- that that
23 was problematic. And she suggested that she didn't
24 have any control over it and that I should take it up
25 with the road foreman of engines so... So that was

Page 60

1  the only -- I guess that was one unique thing that
2  happened that day.
3     Q. All right. Who did you speak with
4  about this inbound train inspection rule?
5     A. The yardmaster.
6     Q. Do you remember who the yardmaster was?
7     A. Her name is Dee. I don't know her last
8  name.
9     Q. D-e-e?
10    A. D-e-e, correct.
11    Q. She's a female yardmaster in Mandan?
12    A. That's correct.
13    Q. Okay. And she said, "I'm a yardmaster.
14 You need to talk to the road foreman"?
15    A. Right.
16    Q. Did you talk to the road foreman?
17    A. Not until the next morning.
18    Q. Who would the road foreman have been at
19 the time?
20    A. Justin Selzler.
21    Q. All right. And I'll -- I have some
22 questions about that. I'll come back to that.
23 But --
24    A. Okay.
25    Q. -- your testimony is you spoke to Dee

Page 61

1  that morning before you left the yard. Was that in
2  person or over the radio or on the phone or -- or
3  what?
4     A. That was in person in her office.
5     Q. And do you know when that inbound train
6  rule went into effect?
7     A. I believe it went into effect either
8  the day before or that day. It was -- it was a
9  recent change.
10    Q. All right. And I'll circle back to
11 that. Let me make a --
12    A. Okay.
13    Q. -- note here just to make sure I hit
14 that. I want to just keep with the narrative on
15 February 5th.
16    A. Okay.
17    Q. You get to the yard --
18    A. We get to Jamestown.
19    Q. -- track and then what happened?
20    A. Okay. So we get to Jamestown. We
21 stop. We secure our cars. We follow the inbound
22 train procedure to secure the cards -- cars and do
23 our securement and safety tests and all that kind of
24 thing, the normal kind of process.
25        We also -- we had a briefing in the cab

Page 66

1 track is lined up, I couldn't even see that.
2      Q. If he's riding the point, would he ride
3 on the engineer's side or on the conductor's side?
4      A. Well, there were two of them so
5 they're -- I would imagine one was on each side, but
6 I don't know that for sure.
7      Q. Would they have lanterns if it's --
8      A. Yes.
9      Q. -- 2:50 in the morning?
10      A. Yes. They would have lanterns and
11 radios. And be -- and they were both wearing their
12 orange vests or some -- some orange.
13      Q. But for -- at -- during the deposition
14 today you don't recall actually seeing them out
15 the -- when you looked in the mirror, you don't
16 recall seeing a conductor on the riding point?
17      A. The -- the track curves into the yard
18 so I don't have any visibility of him. That's why
19 they gave radio signals rather than hand signals.
20      Q. And using the radio versus a lantern or
21 hand signal is an appropriate safety measure?
22      A. Yes.
23      Q. All right. So they tell you back up 20
24 cars. They're riding the point, but you can't see
25 them. What happens next?

Page 67

1      A. I went back just a few cars and
2 Conductor Christianson called over the radio for a
3 stop so I stopped the train.
4      Q. Okay. What happened next?
5      A. After a little bit of time Conductor
6 Christianson asked me to pull the train ahead so...
7 Or, yeah, I think -- but I believe it was ahead one
8 car so I started moving ahead. Now, when you're
9 going ahead the distance isn't as relevant because
10 I'm protecting obviously at that point because I can
11 see out the front windshield versus in a -- in a
12 shoving movement the conductors are my eyes and ears
13 'cause I don't have any visibility behind me.
14      Q. Once they -- you went up ahead what you
15 judged to be a car length or whatever that distance
16 was, did they tell you -- did they then come up to
17 the locomotive cab, Christianson and Carroll?
18      A. They instructed me to stop so I
19 stopped, and then I waited for the next instruction.
20 And I didn't get one for a while so I walked over to
21 the conductor's side of the -- of the cab and looked
22 in the mirror there, and I saw the two of them
23 working their way back up to the front so... It was
24 taking them a while 'cause there was some snow and it
25 was a little bit of a distance so...

Page 68

1      Q. And you could see them walking up to
2 the cab on the conductor's side?
3      A. Correct.
4      Q. From your observations were they
5 discussing with each other anything or just walking
6 or what did you --
7      A. No.
8      Q. -- perceive of their interactions?
9      A. They were just walking one ahead of the
10 other.
11      Q. Who was ahead?
12      A. I don't remember.
13      Q. And then they came up and came into the
14 cab or did you meet them outside?
15      A. They came up into the cab.
16      Q. What did you guys talk about?
17      A. They told me that the -- the switch
18 looked funny or looked weird or some -- something
19 along that lines.
20      Q. Did you ask them what they meant by
21 that?
22      A. I did. And they said that there were
23 spaces on both sides so they didn't know which way
24 the switch was lined.
25      Q. Had you worked in the Jamestown yard in

Page 69

1 the year previous to this incident?
2      A. I don't know if I was -- if I
3 specifically had worked in the Jamestown yard during
4 the previous 12 months. I was qualified on the
5 territory because I had been on the Jamestown sub
6 during that time frame.
7      Q. Were you familiar with the layout of
8 the yard?
9      A. I have basic familiarity, yes.
10      Q. Do you know if the yard had been
11 changed at any point during your time on the railroad
12 with respect to the track layout or anything like
13 that?
14      A. Not in that area. I know they did some
15 maintenance on some other yard tracks. And I don't
16 remember if they added a track or lengthened a track
17 or something possibly. I -- I don't remember as
18 to -- I guess is the best answer there. I don't
19 recall anything.
20      Q. Okay. So this -- this yard track where
21 you came into off the main, does that have a
22 particular name that you refer to it or track number
23 that you can recall?
24      A. I've called it the yard lead before,
25 but I don't know if that's an accurate definition.

Page 70

1  Q. Okay. For today's purposes we'll call
2  that track where this incident occurred the yard
3  lead; is that okay?
4  A. Okay.
5  Q. All right. And do you have any
6  knowledge of any change in the layout of the yard
7  lead or any of its switches during any of your time
8  on the railroad since you became qualified as a
9  locomotive engineer?
10  A. I don't.
11  Q. So they told you that the switch looked
12  weird 'cause there were spaces on each side. Based
13  on your experience as a conductor and as an engineer
14  what did you take that to mean?
15  A. Well, I asked them -- I asked them if
16  we damaged the switch. And at first they didn't know
17  even if the switch was damaged. But they said, "No,
18  we stopped short of the switch." And I asked each
19  one individually multiple times, and each time they
20  told me the same thing, that we were stopped short of
21  it.
22  Q. All right. As a conductor if you don't
23  line a switch appropriately, is that a -- a big deal
24  on the railroad?
25  A. It can be. But, I mean, there are yard

Page 71

1  switches... There are yard switches that get run
2  through in Mandan probably on a monthly basis that it
3  isn't -- I mean, it's not unheard of.
4  Q. There could be big consequences if a --
5  if a switch gets run through; a train could possibly
6  derail?
7  A. It could happen. It typically doesn't.
8  Q. All right. You talked to these guys.
9  They said that they thought they stopped short --
10  A. Yep.
11  Q. -- and that -- but the switch had been
12  gapped on both sides. Did that make sense to you or
13  did you have concerns with what they were telling
14  you?
15  A. Well, I -- I wasn't sure -- you know,
16  with -- with their experience level, I wasn't sure if
17  they -- if the -- if the -- when they said that it
18  looked weird, I wasn't sure what exactly that meant.
19  And when I asked for more clarification on it, they
20  didn't explain it in a way that made sense from a --
21  that I knew 100 percent what was going on standpoint.
22  So after they warmed up I decided to go back and look
23  at the switch myself and see if it was in fact
24  damaged and gapped and all those things.
25  Q. And when they're explaining it to

Page 72

1  you -- when they're explaining what they saw to you
2  before you go back are you thinking, Of all the
3  different things that could happen, one of the things
4  is maybe we went through the switch when it wasn't
5  lined appropriately?
6  A. I did. And that's why I asked them
7  that. And that's why they -- and they told me, like
8  I said on multiple occasions, that we stopped short
9  of the switch.
10  Q. And as they're continuing to explain
11  what occurred and it doesn't make sense, are you
12  thinking, Boy, maybe -- maybe we ran through the
13  switch? Is that getting to be more likely in your
14  mind?
15  A. Well, I have -- I have seen switches
16  that were damaged before. It doesn't -- I mean, I've
17  pulled up on switches that were damaged before.
18  I've -- you know, I've had situations where we've
19  been, you know, going along a main line track and --
20  and the switch wasn't lined correctly or didn't line
21  properly or something as well so it's one possible
22  thing. It's -- it's a possibility, but it's not the
23  only possibility.
24  Q. After you talked to these guys and they
25  were kind of not able to give you a real solid

Page 73

1  explanation, you decided to go back and look at
2  the -- the switch yourself?
3  A. Right. But what they didn't give me a
4  solid explanation on is what the switch looked like.
5  It was the explanation of what was weird about it
6  that I didn't have a good understanding of. They
7  were very clear in saying that we stopped short of
8  the switch.
9  Q. And then at that point do you call in
10  the switch or do you go look at it yourself?
11  A. At that point I put on my gear and the
12  three of us all went out to look at the switch.
13  Q. Why didn't you call it in as soon as
14  you had seen it -- or as soon as you heard of it?
15  A. Well, I -- because I didn't know if it
16  was actually damaged or not at that point. I wanted
17  to confirm it before I called in -- called it in. We
18  were already protecting the switch. Nobody else
19  could move over that switch 'cause our train was
20  parked on the lead.
21  Q. All right. So you put on your gear --
22  that's your helmet, your reflective vest, probably a
23  jacket at that time of year --
24  A. Yeah.
25  Q. -- and you make your way down to the

Page 74

1  switch?
2       A.  There wasn't a helmet, but yes.
3       Q.  Okay.  Where did you -- did you
4  approach it the same direction, from the conductor's
5  side?
6       A.  Yes.  That was the safer side to walk
7  on because the other side was closer to main.
8       Q.  All right.  And when you got up to the
9  switch then what did you see?
10      A.  Okay.  So when I got up to the switch
11 it was -- like they said, it was gapped on both
12 sides.  It was clearly damaged.  And I asked them
13 again if we did that damage or if we for sure stopped
14 short of it, and they said again that they -- that we
15 stopped short of it, each of them.
16      Q.  Did that make sense to you when they
17 were telling you that or did you have questions about
18 that?
19      A.  Well, it's very possible it could have
20 been damaged before we got there.  I don't know.
21      Q.  Well, do you have any information or
22 documentation about any work in the yard that would
23 have occurred before you guys encountered the switch
24 on February 5th?
25      A.  I wouldn't have any knowledge of any

Page 75

1  other trains or anything else that worked in that
2  yard.  I know that there were two locals that
3  typically worked in that yard during the course of
4  the day.  But any number of trains could have gone in
5  there for any number of reasons as well, and I
6  wouldn't have any way to know that.
7       Q.  Do you know when the yard was last
8  inspected before your incident?
9           MR. SAYLER:  Objection.  Foundation.
10 You can answer if you know, Mike.
11      A.  I don't know.
12      Q.  (Mr. Wells continuing)  And do you know
13 when the switch was last operated before your
14 incident?
15      A.  I do not.
16      Q.  Anybody come up to you after the fact
17 and say, "Jeez, Mr. Fink, I feel terrible.  I screwed
18 up the switch and I didn't report it"?  Anything like
19 that?
20      A.  Not till Trainmaster Schneider said
21 that -- that maintenance of way had damaged it
22 earlier.
23      Q.  And when did that conversation occur?
24      A.  When we arrived in Dilworth.
25      Q.  Do you know -- and -- and was that

Page 76

1  based on -- do you know what that was based on?
2       A.  I have no idea.
3       Q.  Do you know if that was based on his
4  best knowledge at the time or do you know if he had
5  done an investigation at that point?
6       A.  I -- I don't know.  I -- my thought at
7  the time was that he talked to somebody out there
8  that had told him that --
9       Q.  All right.
10      A.  -- because he said he was sure that was
11 what happened.
12      Q.  Do you know how switches get reported
13 as damaged to the system interruption desk at all?
14      A.  I believe they get reported -- I think
15 that's -- well, when we got back in the cab, we
16 called the dispatcher and reported it.  I would
17 imagine that he then did something that reports it,
18 but I am not sure how that process works.
19      Q.  Tell me about that.  How do you call
20 the dispatcher?  Is that radio or a call -- cell
21 phone?
22      A.  Either one.  In this case we called on
23 a cell phone.
24      Q.  What did you tell the dispatcher to the
25 best of your recollection?

Page 77

1       A.  I told him that the -- that we got to
2  Jamestown to do our work and that the switch in
3  Jamestown was damaged, and he told us to high --
4  highball the work which means --
5       Q.  What's that?
6       A.  That means skip it.  It's an old
7  railroad term.  If the ball -- you know, a highball
8  means you don't need to stop.  A lowball means you
9  need to stop.  So a highball would mean that you keep
10 going.
11      Q.  Okay.
12      A.  At the time I reported to him what the
13 conductors told me.  But --
14      Q.  That you had stopped short and the
15 switch --
16      A.  Yes.
17      Q.  -- looked gapped?
18      A.  I told him that -- that we had stopped
19 short and that the -- that I went back and looked at
20 the switch myself and the switch is damaged.  But I
21 don't have any way to -- I didn't say this to him,
22 but of course I can't see back there what happened.
23 I'm just relying on the conductors.
24      Q.  All right.
25      A.  And I did -- also that call was on

Page 90

1  he was the conductor?
2  　　A.　No.  Phil Miller was the engineer.  I
3  was the conductor.  He was the brakeman that day.
4  　　Q.　Okay.  And that was a case that
5  Mr. Sayler represented Mr. Jurgens against BNSF?
6  　　A.　Yes.
7  　　Q.　All right.  I have looked at your
8  Complaint in this matter.  Have you looked at the
9  Complaint in this matter?
10 　　A.　No.
11 　　Q.　Okay.  It's a pleading that's filed
12 with the court.  The Complaint says that you met with
13 a claim rep who I understand is -- was that Tony
14 Freidig?
15 　　A.　Yes.
16 　　Q.　And then it -- it says, He met with an
17 attorney for BNSF.  Do you remember who the attorney
18 was for BNSF?
19 　　MR. SAYLER:  John, if you just want to
20 clarify what time period you're talking about.
21 　　Q.　(Mr. Wells continuing)  Well, let's
22 talk about the period prior to your deposition.
23 　　MR. SAYLER:  Deposition in Jurgens?
24 　　MR. WELLS:  Yes.
25 　　MR. SAYLER:  Okay.  Thanks.

Page 91

1  　　A.　Okay.  And the -- and the deposition
2  with Jurgens -- at the deposition I believe was an
3  attorney by the name of Sweeney maybe.  But there was
4  another attorney assigned to the case as co-counsel
5  as well.  He was the one I met with in Mandan with
6  Tony Freidig.
7  　　Q.　Do you know who that was?
8  　　A.　I don't know his name.
9  　　Q.　Do you remember what he looked like?
10 　　A.　Sure, I -- he looks like an attorney.
11 I -- I don't know.
12 　　Q.　Well, we're all cringing.
13 　　A.　He...
14 　　Q.　Was he a tall gentleman?
15 　　A.　Tall gentleman.  White male.  Older
16 than me probably.
17 　　Q.　I think one of Mr. Sweeney's partners
18 at the time was a gentleman named Scott Rauser.  Does
19 that name ring a bell?
20 　　A.　It could be.  I don't remember his
21 name.
22 　　Q.　Do you know if it was one of
23 Mr. Sweeney's partners or employees or another
24 attorney from -- from either the company or somewhere
25 else?

Page 92

1  　　A.　I believe he was related to the
2  attorney, Sweeney as well, and his law firm.  I -- I
3  don't know -- I don't know specifically.  I met him
4  one time.
5  　　Q.　All right.  So you met with Mr. Rauser
6  and Mr. Freidig in Mandan in the terminal there?
7  　　A.　Yes.
8  　　Q.　Rauser or whoever it was, but not
9  Mr. Sweeney?
10 　　A.　Correct.
11 　　Q.　All right.  And it was a different
12 attorney than the person that took your deposition,
13 and that was Mr. Sweeney?
14 　　A.　Correct.
15 　　Q.　Did you also speak with Mr. Jurgens'
16 attorney prior to the deposition?
17 　　A.　Prior to the meeting with -- including
18 Tony Freidig or prior to the deposition at the hotel?
19 　　Q.　Either.
20 　　A.　I met with him -- or not met with him.
21 Excuse me.  Had a conversation with him over the
22 phone maybe the day before the deposition some -- in
23 that time frame for probably 15 or 20 minutes.
24 　　Q.　And I have read the deposition
25 transcript.  That was a Mr. Tello.  Was that who you

Page 93

1  met with?
2  　　A.　Yes, that's who I spoke with on the
3  phone.
4  　　Q.　And did that meeting happen after this
5  meeting with Tony Freidig and potentially Mr. Rauser?
6  　　A.　Yes.
7  　　Q.　When you met with -- in the
8  pre-deposition meeting with Mr. Freidig and
9  Mr. Rauser, what kinds of things did you talk about?
10 　　A.　He asked about kind of the events of
11 the day basically.
12 　　Q.　Okay.  What you observed of your
13 co-worker when he was injured in this incident?
14 　　A.　Right.  Which I did not observe him
15 fall.  I only observed him walking back to the cab
16 and climbing into the engine.
17 　　Q.　Okay.  And then you talked with
18 Mr. Jurgens after the incident while you guys were in
19 the locomotive cab as well?
20 　　A.　Yes.  Phil Miller and I and he spoke,
21 yes.
22 　　Q.　Okay.  And what occurred during that
23 meeting?  You said you talked to them about the
24 incident, but you said it's the primary basis for why
25 we're here today.

Page 94

1  A. I --
2  Q. Connect those two for me, please.
3  A. Okay. Well, I said that it was part of
4  the reason that I was here today. The -- but the --
5  the conversation that was in the cab was Mr. Jurgens
6  saying that he had injured his knee when he was back
7  protecting the shove essentially.
8  Q. Okay. And what -- let's move forward
9  in time to your conversation with the -- BNSF's
10  outside attorney and -- and Mr. Freidig.
11  A. Okay.
12  Q. What happened in that meeting that you
13  think brings us here today?
14  A. Well, I -- part -- part of it was
15  that -- I mean, initially he asked if -- when
16  Mr. Jurgens arrived at work if he seemed to be having
17  any problems with his knee. And I said, "No." He
18  then pressed on it further and asked if it was
19  possible that he had injured himself before he came
20  to work that day. And I said, "I didn't see any sign
21  of that." And then he said, "It would really help
22  our case if you did see something like that." And I
23  said, "Well, I didn't see something like that." And
24  then he immediately asked me if I enjoyed working for
25  BNSF.

Page 95

1  Q. And who said this? You're saying the
2  outside attorney said this?
3  A. That's correct.
4  Q. All right. And from that you
5  insinuated that he was trying to get you to give
6  improper testimony?
7  A. That's what it appeared to me, yes.
8  Q. All right.
9  A. That was -- that was the tone of the
10  conversation.
11  Q. All right. What year was this?
12  A. I don't know. I'm sure it's in the
13  records somewhere.
14  Q. This is years -- years before this
15  February 2019 incident?
16  A. Yes. Or -- yeah.
17  Q. All right. Do you know if Mr. Rauser
18  was joking or being serious when he said this
19  information?
20  A. He didn't appear to be joking.
21  Q. Do you know if Mr. Rauser had a basis
22  in fact for questioning whether Mr. Jurgens had a
23  preexisting knee injury?
24  A. Not that he shared with me.
25  Q. Did you testify that Mr. Jurgens wore a

Page 96

1  knee brace?
2  A. I don't know if he wore a knee brace or
3  not.
4  Q. Okay. We'd have to look at your
5  deposition for that?
6  A. I -- I'm -- I'm telling you today I
7  have no idea whether he wore a knee brace or didn't
8  wear a knee brace.
9  Q. So you go to the deposition then and
10  you testify that you didn't know if he had a -- any
11  previous injury?
12  A. Correct.
13  Q. And then did you ever talk to this
14  attorney again?
15  A. No.
16  Q. Did you ever talk to Tony Freidig
17  again?
18  A. No.
19  Q. After that meeting -- and then at some
20  point you testified at trial too; right?
21  A. I -- I should clarify. I have talked
22  to Tony Freidig since that meeting. Not specifically
23  about this or anything case related. He talked to me
24  at the Jurgens trial at one point, but it was more of
25  a how's the weather kind of conversation. It wasn't

Page 97

1  a -- anything like that. And I also talked to him --
2  I believe it was him -- related to an incident where
3  my truck was hit in a parking lot by a skid-steer
4  that was doing snow removal that was completely
5  unrelated as well.
6  Q. All right. And in either of those
7  instances did Mr. Freidig say, "Yeah, I'd like to
8  help you but, sorry, you testified unfavorably to
9  us"?
10  A. Well, the first one happened prior to
11  testifying so there's no way he could have said that.
12  The second one was at the courthouse, and it wasn't
13  about anything that we were -- it wasn't -- it was
14  just a how's the weather kind of casual conversation.
15  Q. Mr. Freidig's never been rude or
16  untoward to you in any way; has he?
17  A. No, I have no issue with Mr. Freidig at
18  all.
19  Q. All right. This meeting with -- prior
20  to your deposition where you say you felt like you
21  were pressured to lie, was that meeting recorded at
22  all?
23  A. I don't believe so.
24  Q. You don't have any recordings of it?
25  A. I don't have any recordings, no.

25 (Pages 94 - 97)

Page 98

1    Q.  And you testified truthfully in your
2  deposition; correct?
3    A.  Yes.
4    Q.  You testified truthfully then in the
5  Jurgens trial?
6    A.  Yes.
7    Q.  Did anybody call you prior to the trial
8  and say, "Hey, Mr. Fink, this -- we really need your
9  help on this case and we need you to change your
10  testimony"?
11    A.  No.
12    Q.  After this conversation happened with
13  Mr. Freidig and the outside attorney, did you make
14  any complaints to anybody?
15    A.  No.
16    Q.  Did you tell your union, "Hey, I need
17  representation.  These guys are pressuring me to tell
18  an untruth"?
19    A.  No.
20    Q.  Did you tell Mr. Tello, "Hey, these
21  guys prior to the deposition told me to tell an
22  untruth"?
23    A.  I don't believe so, no.
24    Q.  Did you make any complaints to anybody
25  else at BNSF that these -- this attorney apparently

Page 99

1  told you to lie at a deposition?
2    A.  No.
3    Q.  Did you complain to any of the bar
4  associations that an attorney pressured you to lie at
5  a deposition?
6    A.  I wouldn't even know how to do that.
7    Q.  Why not?  Why -- why didn't you bring
8  it up to Mr. Jurgens' attorney?  Why didn't you bring
9  it up to your union?  Why didn't you tell anybody
10  that this really improper activity occurred?
11    A.  When I pushed back on it, they changed
12  the line of questioning.
13    Q.  Is it possible that they were trying to
14  determine what you knew about his preexisting
15  injuries, if any?
16    A.  I had already answered that question
17  twice to him.
18    Q.  And have you -- did you -- you said you
19  reviewed the trial transcript testimony prior to this
20  deposition.  Did you also review the deposition
21  transcript testimony prior to this deposition?
22    A.  I don't -- yeah, probably, yes.
23    Q.  All right.
24    A.  I read through it.
25    Q.  And did you see that you testified in

Page 100

1  that deposition that Mr. Jurgens had told you the day
2  of the incident that he had prior knee surgery or
3  replacement?
4    A.  He did tell me that he had had surgery
5  on that knee previously, yes.
6    Q.  And are you now testifying under oath
7  that an attorney affirmatively asked you to lie in a
8  deposition?
9    A.  That was my impression.
10    Q.  And that's more of your impression
11  rather than -- he didn't say, "I know you saw X, but
12  I want you to say Y"; right?
13    A.  He did not say, "I know you saw X, but
14  I want you to say Y."
15    Q.  He didn't say, "I know you don't know
16  about his preexisting injury, but I want you to say
17  he was injured"?
18    A.  He did not say that, no.
19    Q.  As an engineer do you have an
20  obligation to report dishonest conduct?
21        MR. SAYLER:  Of BNSF attorneys?
22    Q.  (Mr. Wells continuing)  Well, of
23  anything dealing with your BNSF responsibilities.
24        MR. SAYLER:  I don't know why there
25  would be a rule that he has to report the conduct

Page 101

1  of --
2    Q.  (Mr. Wells continuing)  I'm just asking
3  if you're aware of the rule.
4        MR. SAYLER:  -- BNSF attorneys so...
5    Q.  (Mr. Wells continuing)  Mr. Fink, are
6  you obligated to report dishonest conduct that you
7  observe?
8    A.  Tony Freidig was in the room too so
9  who -- I mean...
10    Q.  Well, okay.  Did you report dishonest
11  conduct on Tony Freidig's behalf?
12    A.  I didn't report dishonest contact to
13  anyone at BNSF.  BNSF was already involved in the
14  meeting.
15    Q.  And is that something you're supposed
16  to do if you observe dishonest conduct of any BNSF
17  employee or officer?
18    A.  I suppose, yes.
19    Q.  All right.  Being deposed is kind of
20  stressful; is that right?
21    A.  Yes.
22    Q.  Kind of have your hackles up or be
23  anxious about the process; is that fair?
24    A.  Yes.
25    Q.  Prior to Mr. Jurgens' deposition had

26 (Pages 98 - 101)

Page 102

1  you ever been deposed before?
2      A.  No.
3      Q.  Is it possible that your perception of
4  what Mr. Rauser was asking you was different than
5  what actually happened?
6      A.  I doubt it.
7      Q.  Okay.  Why?
8      A.  'Cause I was in the room.  I heard the
9  tone in his questions.  And when I didn't give him
10  the answer he was looking for, he immediately asked
11  me if I enjoyed working for BNSF, which I thought
12  was -- I took as a subtle threat.
13     Q.  Okay.  And again this happened at least
14  a year prior to this February 2019 incident?
15     A.  Yes.  It would have been...
16         MR. SAYLER:  For the record, I think
17  the deposition is October of 2018 so...
18     A.  Okay.  It would have been before that
19  even significantly.
20     Q.  (Mr. Wells continuing)  All right.
21  Let's shift gears here.  Your Complaint talks about
22  an incident near Hettinger, South Dakota, where there
23  was an issue with a coal train.  Hettinger is in
24  North Dakota; right?
25     A.  No.

Page 103

1      Q.  Okay.  What is the incident near
2  Hettinger, South Dakota, that you're talking about?
3      A.  I wasn't part of that train crew.
4      Q.  Do you have any personal knowledge
5  about what the allegation in your Complaint about
6  Hettinger, South Dakota, is?
7      A.  Okay.  The Hettinger, South Dakota,
8  train incident was part of a safety marathon where it
9  was discussed that the train went into emergency
10  because it broke in two.  And the front end -- the
11  head end of the train went into emergency and the
12  rear end did not, and then the rear end of the train
13  the air bled off and rolled back unprotected
14  acrost -- acrost railroad crossings and things like
15  that.  But I was not part of that train crew.
16     Q.  This was just something you had heard
17  about in a safety marathon?
18     A.  Right.
19     Q.  When did that safety marathon occur?
20     A.  I don't know the date of it.
21     Q.  In a safety marathon were you told
22  about any root causes or reasons why the break-apart
23  occurred?
24     A.  Why the -- why the train broke apart?
25     Q.  Yeah.

Page 104

1      A.  No.
2      Q.  Were you -- why was it being discussed
3  in the safety marathon to your recollection?
4      A.  Because there were -- there was a
5  concern that that could happen on other trains so
6  people should be aware of that and secure the
7  rear end of the train that's not connected to the
8  locomotive head.
9      Q.  Okay.  And who do you recall
10  participating in the safety marathon with you?  Was
11  this at Mandan?
12     A.  This would have been at Mandan.  We did
13  safety marathons on a fairly regular basis.  I can't
14  tell you who was in the room with me.  It would have
15  been whoever happened to go on duty about the same
16  time as me or who was part of my crew.  And then the
17  people running the safety marathon, whoever was
18  scheduled for that particular time frame throughout
19  the day.
20         So the way that works is you might have
21  a crew or two crews or a yard shift or whoever
22  happens to go on duty at that time would go in and
23  get the safety briefing for the safety -- excuse
24  me -- for the safety marathon.  And then -- and
25  they -- there's a log, the -- so you could look back

Page 105

1  to the log to see who participated in that safety
2  marathon.
3      Q.  All right.  And why was it -- as far as
4  trying to prevent it, what -- what did it have to do
5  with this -- the air brakes or anything like that to
6  your recollection?
7      A.  Because it was related to the same
8  issue with the control valves that were not being
9  properly maintained.
10     Q.  How so?
11     A.  Because the entire train didn't go into
12  emergency which is what should happen if the control
13  valves are operating properly.
14     Q.  Okay.  Previously you talked about an
15  inbound inspection rule --
16     A.  Yes.
17     Q.  -- put into place you said sometime in
18  early February 2019.
19     A.  Yes.
20     Q.  Was it your testimony that this inbound
21  inspection protocol was put in place to address those
22  air brake control valve issues?
23     A.  That is what we were told.  But in fact
24  the inbound air brake -- or the inbound inspection
25  rule being applied on outbound trains would actually

27 (Pages 102 - 105)

Page 106

1  mask the issue, not resolve the issue.  So it would
2  prevent the crew members from knowing whether or not
3  the air brakes were functioning properly as opposed
4  to the previous method where you could determine that
5  the -- the control valves on certain cars were not
6  operating properly and then they could be set out and
7  repaired.
8       Q.  All right.  So the previous method,
9  would we call that the outbound inspection method?
10      A.  Yes.
11      Q.  Can you walk me through the --
12      A.  Or -- or Class --
13      Q.  I'm sorry.
14      A.  It would be a Class 1 inspection.
15      Q.  Class 1 air brake inspection?
16      A.  Yes.
17      Q.  Can you walk me through the steps of a
18 Class 1 air brake inspection?  And then the next
19 question -- or maybe you can do it at the same time,
20 but then I'm going to ask you to go through what an
21 inbound inspection is and -- and why they're
22 different in your mind.
23      A.  Sure.  And it has been three years
24 since I've done one so I'll give you the -- the
25 general outline.  It's also in the air brake and

Page 107

1  train handling rules that are provided to everyone as
2  well, all the steps of them.  But the --
3       Q.  Best of your recollection is fine, sir.
4       A.  Okay.  The Class 1 inspection would
5  start with releasing the brakes so that all the air
6  brakes were released -- or having the brakes
7  released.  And then setting a 20-pound air brake set
8  as indicated by the rear of the train which would be
9  either a -- a rear end device or a distributed power
10 unit.
11      The -- then what would happen is a
12 carman and/or conductor or whoever was performing the
13 inspection would walk or ride or somehow view each
14 brake on each car all the way throughout the train
15 and make sure that that brake set properly.  The
16 requirement coming out of an originating terminal
17 like Mandan would be that you have a hundred percent
18 of those brakes set properly.
19      Q.  And are you looking to make sure that
20 the piston comes back out?
21      A.  Right.  You're looking to see how --
22 that the piston travels the -- the correct distance
23 for the car.  Which I don't remember the exact
24 distance anymore at this point but...
25      Q.  Do you have a gauge to help you with

Page 108

1  that?
2       A.  There is a gauge, but I don't know that
3  the gauge is used on every single piston.  Once
4  you've done a handful of them, you can see that
5  piston distance is, you know, significant or it's not
6  -- it's -- it's usually all the way out or all the
7  way in.  It's not usually somewhere in between.  If
8  it's somewhere in between, then that would be a
9  problem.
10      So -- so as you're either walking -- or
11 in the carmen's case, they -- they ride.  Or you can
12 also potentially do it from a van or utility vehicle
13 of some sort as well.  But the -- the key to it is to
14 look at every -- each individual brake and make sure
15 that that brake is set properly.
16      And once you have confirmed that, then
17 you do a release on it, and then you would again look
18 at each individual brake and make sure the release
19 was proper as well.  There's a step-by-step -- like I
20 said, a step-by-step process in the -- in the air
21 brake and train handling rules.
22      So in addition to that, at the same
23 time you're looking for other general safety things
24 not related to air brakes as well.  Like, for
25 example, a -- a piece of metal hanging off the side

Page 109

1  of a car or, you know, a strap that's broken or
2  something like that that might cause a problem down
3  the road -- or down the track as well so...  Go
4  ahead.
5       Q.  The carman or the -- or the conductor
6  or whoever is doing the air brake test is looking for
7  anything bent, broken or missing as far as safety
8  appliances; right?
9       A.  Correct.
10      Q.  Okay.  So that's the general overview
11 of the Class 1 air brake that we're calling the
12 outbound method?
13      A.  Uh-huh.
14      Q.  What's the inbound method?
15      A.  So the inbound method is to -- rather
16 than -- well, and I guess there's -- there's another
17 part to that too in that you could -- you would put a
18 train into emergency and make sure that it goes into
19 emergency throughout the entire train.  But --
20      Q.  Something you need every time you do an
21 outbound air brake test?
22      A.  No, it's not.
23      Q.  Okay.  Another option?
24      A.  Another option, yes.  So the -- the
25 inbound inspection rule requires you rather than to

Page 110

1  set the 20 pounds to see if it -- if it -- if the
2  brakes set, when you release the brake instead you
3  release to a -- a service level or you release the
4  air in the cars all the way down to zero, which is a
5  slower release as opposed to an emergency release
6  which is easier for the control valves to handle but
7  it's not testing their capabilities then.
8       So then if you do that in conjunction
9  with your air brake test instead of doing the full
10 Class 1 the correct way, what happens is you don't
11 find out that there are certain cars that aren't
12 either setting or releasing brakes correctly because
13 it's a slower release.
14      Q.  Okay.  Got it.  And you were told to do
15 this on February 5th when you got to Mandan?
16      A.  Yes.  That's the next time I worked
17 after the rule was put in place.
18      Q.  It was -- whether it was February 4th
19 or 5th, it was the beginning of your shift before the
20 switch was run through?
21      A.  Correct.
22      Q.  Or the switch incident?
23      A.  Yep.
24      Q.  Okay.  So it was the beginning of that
25 shift was the first time you were told about it?

Page 111

1       A.  Correct.
2       Q.  And you were told to take it up with
3  Selzler?
4       A.  Yep.
5       Q.  And it's the middle of the night
6  probably so you didn't connect with Selzler that
7  night?
8       A.  Correct.
9       Q.  Did you follow up with him after this
10 incident?
11      A.  Yes.  I spoke with him when I was in
12 Trainmaster Schneider's office.  After Mr. Schneider
13 had said that -- that he thought maintenance damaged
14 the switch, I asked him about the inbound inspection
15 rule.  He'd be a trainmaster rather than a
16 yardmaster, but he's not engine qualified so he
17 didn't really understand it that well so he also
18 referred me to Road Foreman of Engines Selzler --
19 Selzler who then I -- then he called for me on his
20 cell phone.
21      Q.  When did he call you on his cell phone?
22      A.  No.  Trainmaster Schneider called Road
23 Foreman of Engines Selzler on Schneider's phone.
24      Q.  Right while you were there that night?
25      A.  While we were there in his office that

Page 112

1  morning, yes.
2       Q.  And what did -- what did -- did you
3  talk with Road Foreman Selzler?
4       A.  Yes, I did.
5       Q.  What did you talk about?
6       A.  We talked about the inbound inspection
7  rule.
8       Q.  What did he say?
9       A.  And -- and I explained to him my
10 concerns about it being a safety issue because crews
11 will not know if their train is properly going into
12 emergency braking or not when they leave the yard by
13 following that procedure which is designated
14 specifically to be an inbound inspection, not an
15 outbound inspection.
16      Q.  And what did he say in response?
17      A.  He disagreed with me, and we had a
18 conversation about it.  And -- and -- and -- sorry.
19 My dog doesn't like the question apparently.
20      Q.  We can take a quick break and deal with
21 him quick.
22      A.  Sure.
23      Q.  Okay.  We can go off the record.
24      A.  Okay.
25

Page 113

1       (Off the record from 2:47 p.m. to
2  2:48 p.m.)
3       Q.  (Mr. Wells continuing)  So you -- I
4  think at the time the dog started barking you were
5  explaining that Mr. Selzler was saying he disagreed
6  with your assessment?
7       A.  Yes.
8       Q.  Do you know why he disagreed with your
9  assessment?
10      THE WITNESS:  Will you get the dog?
11 Take the dog.
12      A.  He -- he said that you could still do
13 the emergency test, and that how you would do the
14 emergency test would be to essentially cut off the
15 air brake valve between the engines and the first car
16 and then put the head end into emergency and see if
17 the rear end of the train went into emergency as
18 well.
19      And what I had told him at the time is
20 that there's a radio signal that goes between the
21 head end and the rear end of the train that will
22 automatically put the rear end of the train into
23 emergency if I create a manual emergency at the head
24 end.
25      And I told him the better test would be

Page 134

1   Q. (Mr. Wells continuing) Well --
2       MR. SAYLER: -- give you a percentage,
3   but go ahead and ask --
4   Q. -- would the --
5       MR. SAYLER: -- again I guess.
6   Q. (Mr. Wells continuing) -- brakes still
7   apply when the train's put into emergency?
8   A. I'm sorry. I didn't catch that.
9   Q. Would the brakes still apply when the
10  train's put into emergency, this inbound protocol is
11  used?
12  A. The inbound protocol does not create a
13  bigger problem. It masks a problem if it exists.
14  Q. And if a problem exists, is your
15  testimony that the train would not be able to go into
16  emergency at all?
17  A. My experience is that a train does --
18  that a train would only partially go into emergency
19  instead of completely going into emergency, which is
20  an unsafe condition.
21  Q. What is that experience? Tell me about
22  that.
23  A. Okay. I was on a coal load, for
24  example, headed to Dilworth. I was working with -- I
25  can't think of the name of the conductor right now.

Page 135

1   I'll try to remember it as we go on. Working on a
2   coal load from Mandan to Dilworth. The -- these
3   inspection -- and this was probably a week after my
4   conversation with Selzler in Trainmaster Schneider's
5   office.
6       And we proceeded eastbound. When we
7   got to the west end of Jamestown, the rear of the
8   train went into emergency and only part of the cars
9   went into emergency because the -- there was a
10  defective brake valve in the train that resulted in
11  all the cars ahead of that car not going into
12  emergency versus all of the cars going into emergency
13  like would happen in a proper emergency braking
14  instance.
15      Luckily it was the head end of the
16  train that I was controlling as opposed to the rear
17  end of the train which would have been completely
18  uncontrolled in that -- in the opposite scenario so I
19  was able to stop the head end of the train using a
20  combination of dynamic braking and a full-service
21  reduction. But the head end of the train did not go
22  into emergency.
23  Q. And was this a scenario where you could
24  have done your modified emergency test plus your
25  additional test?

Page 136

1   A. No. This was a -- this was a scenario
2   where when we got on the train we were told all the
3   inspections were done and that we were to take it out
4   of the yard.
5   Q. All right. So this was after your
6   February 5th incident. I think the Complaint says
7   it's February 10th so just a few days after --
8   A. Yep.
9   Q. -- your incident. And by that time you
10  hadn't adopted your modified test protocol?
11  A. I -- I only did that when I was in
12  charge of the air brake testing.
13  Q. All right. And what did you do in
14  response to that situation occurring once you got
15  the -- the train secured? Did you call it into the
16  mechanical desk? Did you call the road foreman?
17  What did you do with that information?
18  A. We notified the dispatcher. Road
19  Foreman Selzler as well. Had conversations with him
20  as well. And at that point I also reported it to the
21  Federal Railroad Administration who told me that they
22  would be in contact with Mr. Selzler to get more
23  information.
24  Q. All right. And how did you report it
25  to the FRA?

Page 137

1   A. I took -- I spoke with the local FRA
2   representative and provided him information on it.
3   Q. Who was that; do you recall?
4   A. I do not remember his name. I could
5   find out for you.
6   Q. Did you speak with him on the phone or
7   did you send him an email or how -- how did that
8   occur?
9   A. I met with him in person.
10  Q. Where did you meet?
11  A. I don't remember exactly where
12  we met. I think it was outside a movie theater.
13  The Grand Theatre in Bismarck maybe.
14  Q. Why did you meet him there?
15  A. That's where he happened to be --
16  Q. Oh, you called him --
17  A. -- at the time that I called him.
18  Q. -- on the phone and he said, "Hey, I'm
19  in town. Let's -- I'm right over here," and you
20  said, "Hey, I can get there"?
21  A. Yep. So we talked in the parking lot.
22  Q. Okay. I thought I was dealing with
23  some kind of a --
24  A. Actually now that I think about it, it
25  wasn't --

Page 194

1  nothing's there to stop them; is that fair?
2      A.  Right. Right. Yeah, if -- well, if
3  they don't have air, they'll stop. The -- the --
4      Q.  No, I'm sorry.
5      A.  -- control valve would --
6      Q.  Other way around.
7      A.  Yes. The control -- the control valve
8  is there to create an emergency release of air. So
9  if -- you know, in your example if one of the brake
10 valves in the middle of the train wasn't working,
11 half of the cars either way the brakes would not set
12 and you would have the same problem as I described,
13 that the train would not properly stop in an
14 emergency situation.
15     Q.  Is that a critical safety issue?
16     A.  That is absolutely a critical safety
17 issue.
18     Q.  Is that a huge safety issue not just
19 for railroad workers but for the public as well?
20     A.  Yes, that's correct. In fact if -- if
21 it happens to be the -- if the -- the break or
22 knuckle or break in the air hose or whatever causes
23 the emergency brake application would occur on the
24 head end of the train prior to wherever that valve
25 was defective, the entire rear end of the train would

Page 195

1  essentially continue moving completely unrestricted
2  and completely uncontrolled. So if you were going up
3  a hill when that happened, that -- that half of the
4  cars potentially within that -- that train could roll
5  free wherever the grade of the track might take it.
6      Q.  And that would take -- that could
7  potentially take it through railroad crossings, take
8  it through towns; is that fair?
9      A.  Yes.
10     Q.  And that -- that's the same whether
11 it's a coal car or a grain car or cars full of
12 ethanol and chlorine; right?
13     A.  That's correct.
14     Q.  Okay. Just one last little question
15 here. At the investigation hearing, after that was
16 done did you have any discussions with Mr. Keel?
17     A.  Yes. Immediately following the
18 investigation after the recording was -- was done and
19 the investigation was completed, Mr. Keel talked to
20 everyone that was involved in the investigation from
21 a principal standpoint. So that would have been
22 Mr. Christianson, Mr. Carroll, Phil Miller, Ben
23 Fricke, Jeremy Blazer, Cordell Booke and myself.
24         And at that time he indicated that
25 these charges were -- and I don't remember --

Page 196

1  exaggerated I believe was the word that he used. And
2  that he -- his recommendation for coming out of the
3  investigation was going to be a written warning to
4  Mr. Christianson and Mr. Carroll, and that his
5  recommendation was going to be that I was completely
6  exonerated because he didn't see any indication of
7  dishonesty and he didn't see any rules that were
8  violated within our -- within the investigation.
9      Q.  That's all the questions I have, Mike.
10 Thank you.
11     A.  Okay.
12     Q.  Mr. Wells probably has some for you.
13            EXAMINATION
14 BY MR. WELLS:
15     Q.  Just briefly about this so-called
16 conversation you had with Mr. Keel. That was the day
17 of the disciplinary hearing?
18     A.  That's correct.
19     Q.  And who besides you and the other
20 operating crew and your union representatives were
21 there?
22     A.  Mr. Keel.
23     Q.  Anyone else?
24     A.  No.
25     Q.  Was -- no other management employee was

Page 197

1  there to overhear this?
2      A.  No. Mr. Schneider had already left.
3      Q.  All right. Did you guys --
4      A.  He was the only -- sorry.
5      Q.  Did -- did you guys talk amongst
6  yourselves and say, "Boy, I can't believe Mr. Keel
7  said that"?
8      A.  No. Which we were part of the
9  investigation as well. We all had kind of the same
10 opinion.
11     Q.  Do you have any documentation, text
12 messages, correspondence with each other saying,
13 "Boy, that went really well. Thanks for helping me
14 during that investigation"?
15     A.  No.
16     Q.  "I think what Mr. Keel make -- said
17 makes sense," anything along those lines?
18     A.  I -- I -- I do not. We had a
19 conversation in the hallway after the -- after
20 everyone was dismissed, but that was myself and
21 Cordell Booke and Jeremy Blazer.
22     Q.  All right. And how -- this was just a
23 two- -- two-, three-minute conversation or how long
24 did it -- did he talk to you guys after the
25 conference -- after the hearing?